1  Dana N. Gwaltney (SBN 209530)
   dgwaltney@shb.com
2  Sara J. Romano (SBN 227467)
   sromano@shb.com
3  SHOOK, HARDY & BACON L.L.P.
   333 Bush Street, Suite 600
4  San Francisco, California 94104-2828
   Telephone:    415.544.1900
5  Facsimile:    415.391.0281

6  Attorneys for Defendants
   GUIDANT CORPORATION, GUIDANT SALES
7  CORPORATION, CARDIAC PACEMAKERS, INC., and
   BOSTON SCIENTIFIC CORPORATION

8

9               UNITED STATES DISTRICT COURT

10           NORTHERN DISTRICT OF CALIFORNIA

11

12  SETA SAAD and CHRISTIAN E. SAAD,      )   Case No. **08—0053**
    individually and as representatives of the Estate )
13  of RAYMOND SAAD,                       )   NOTICE OF REMOVAL OF GUIDANT
                                           )   CORPORATION, GUIDANT SALES
14              Plaintiffs,                )   CORPORATION, CARDIAC PACEMAKERS,
                                           )   INC., AND BOSTON SCIENTIFIC
15       vs.                               )   CORPORATION UNDER 28 U.S.C. §§ 1441,
                                           )   1446 AND 1332 (DIVERSITY) AND
16  GUIDANT CORPORATION; GUIDANT           )   REQUEST FOR JURY TRIAL
    SALES CORPORATION; CARDIAC             )
17  PACEMAKERS, INC.; BOSTON SCIENTIFIC    )
    CORPORATION; ASHLEY & MCMULLEN-        )   Complaint filed: October 29, 2007
18  WING SUN MORTUARY, a business entity   )
    form unknown; ASHLEY & MCMULLEN, a     )
19  business entity form unknown; and DOES 1 )
    through 20, inclusive,                 )
20                                         )
                Defendants.                )
21

22

23       Pursuant to 28 U.S.C. § 1441(a) and 28 U.S.C. § 1446, Defendants Guidant Corporation,

24  Guidant Sales Corporation, Cardiac Pacemakers, Inc. and Boston Scientific Corporation

25  (collectively "Guidant") file this Notice of Removal of this case from the California Superior Court

26  for the County of San Francisco to the United States District Court for the Northern District of

27  California. In support of this Notice of Removal, Guidant states the following:

28

                                                        NOTICE OF REMOVAL

133393V3

## GUIDANT MDL

1.      This action is one of over 2,000 products liability actions against Guidant that have been brought in or removed to federal courts across the country. As a result of these numerous suits, on November 7, 2005, pursuant to 28 U.S.C. § 1407, the Judicial Panel on Multi-District Litigation ("JPML") entered a transfer order establishing an MDL entitled *In re Guidant Corporation Implantable Defibrillators Products Liability Litigation*, MDL-1708, and transferring and consolidating a number of cases to the United States District Court, District of Minnesota ("MDL Court" or "MDL 1708").[1] Among the primary purposes of consolidating these cases cited by the JPML was to conserve judicial resources and avoid inconsistent rulings.[2]

2.      More than 2,020 cases are currently pending in the MDL. Once removed, Guidant intends to seek inclusion of the instant case within the MDL proceeding. And once transferred, all pretrial issues will be governed by orders entered by the Honorable Donovan W. Frank, who presides over MDL 1708.

## REMOVAL PROCEDURES

3.      On October 29, 2007, this action, entitled *Seta Saad and Christian Saad, individually and as representatives of the Estate of Raymond Saad v. Guidant Corporation, Guidant Sales Corporation, Cardiac Pacemakers, Inc., Boston Scientific Corporation, Ashley & McMullen-Wing Sun Mortuary, a business entity form unknown; Ashley & McMullen, a business entity form unknown; and Does 1 through 20, inclusive*, was filed in the Superior Court for the State of California in and for the County of San Francisco, Case No. CSC-87-468614.

4.      Guidant Corporation was served with the complaint on December 6, 2007. To date, Guidant Sales Corporation, Cardiac Pacemakers, Inc. and Boston Scientific Corporation have not been served.

5.      Under 28 U.S.C. §1446(b), the notice of removal of a civil action shall be filed within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial

---

[1] A true and correct copy of the transfer order establishing MDL 1708 and transferring and consolidating a number of cases to the District Court of Minnesota is attached as Exhibit A.
[2] *Id.* at 2.

NOTICE OF REMOVAL

133393V3

1    pleading setting forth the claim for relief upon which such action or proceeding is based. To trigger

2    the 30-day removal period, the defendant must receive the summons and complaint by proper

3    service. *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 354 (1999). Thus,

4    this removal is timely.

5         6.    A copy of all process, pleadings, and orders served upon Guidant in this action is

6    attached as Exhibit B. *See* 28 U.S.C. § 1446(a). There have been no proceedings in this action in

7    the San Francisco County Superior Court involving Guidant, nor have any of these Defendants filed

8    responsive pleadings or otherwise responded to Plaintiffs' complaint. Guidant reserves any and all

9    rights to assert any and all defenses to Plaintiffs' complaint.

10        7.    Finally, venue is proper pursuant to 28 U.S.C. § 1391 because this action was pending

11   in San Francisco County Superior Court.

12                      **DIVERSITY JURISDICTION EXISTS**

13        8.    This Court has original jurisdiction over this lawsuit under 28 U.S.C. § 1332. And

14   this diversity action may be removed to this Court under 28 U.S.C. §§ 1441 and 1446. Suits that do

15   not arise under federal law are removable "if none of the parties in interest *properly joined* and

16   served as defendants is a citizen of the State in which such action is brought." 28 U.S.C. § 1441(b)

17   (emphasis added). The only other requirement for diversity jurisdiction is that the amount in

18   controversy exceed $75,000. *Id.* § 1332(a).

19        9.    Plaintiffs Seta Saad and Christian Saad are citizens and residents of California.[3]

20        10.   Guidant Corporation is a Minnesota corporation with its principal place of business in

21   Minnesota. For purposes of diversity of citizenship, a corporation is deemed to be a citizen of both

22   the state of its incorporation and of the state where it has its principal place of business. 28 U.S.C.

23   § 1332(c)(1). Thus, pursuant to 28 U.S.C. § 1332(c)(1), Guidant Corporation is a citizen only of

24   Minnesota.

25        11.   Guidant Sales Corporation is a wholly-owned subsidiary of Cardiac Pacemakers, Inc.,

26   which is a wholly-owned subsidiary of Guidant Corporation. It is also a Minnesota corporation with

27   [3] Plaintiffs' Complaint ("Compl.") at ¶¶ 3-4.

28                                  3

1   its principal place of business in Minnesota.   Thus, pursuant to 28 U.S.C. § 1332(c)(1), Guidant

2   Sales Corporation is a citizen of Minnesota.

3       12.   Cardiac Pacemakers, Inc. is a Minnesota corporation with its principal place of

4   business in Minnesota.   Thus, pursuant to 28 U.S.C. § 1332(c)(1), Cardiac Pacemakers, Inc. is a

5   citizen of Minnesota.

6       13.   Boston Scientific Corporation is incorporated in the state of Delaware and has its

7   principal place of business in Massachusetts.   Thus, pursuant to 28 U.S.C. § 1332(c)(1), Boston

8   Scientific Corporation is a citizen of Delaware and Massachusetts.

9       14.   According to the complaint, Defendant Ashley & McMullen-Wing Sun Mortuary is a

10  business entity, form unknown, that operates a mortuary located in San Francisco, California.[4]

11      15.   According to the complaint, Defendant Ashley & McMullen is a business entity, form

12  unknown, that operates the Ashley & McMullen-Wing Sun Mortuary located in San Francisco,

13  California.[5]

14      16.   Upon information and belief, Defendants Ashley & McMullen-Wing Sun Mortuary

15  and Ashley & McMullen (collectively "Ashley & McMullen") are citizens and residents of

16  California.

17      17.   However, Ashley & McMullen's California citizenship is irrelevant for removal

18  purposes because, as set forth in more detail below, Ashley & McMullen is improperly joined.

19  Thus, no properly-joined defendant is a resident of California, and complete diversity of citizenship

20  exists between Plaintiffs and Guidant.   See 28 U.S.C. § 1441(b).

21      18.   All properly-joined Defendants consent to this Notice of Removal.   Defendants who

22  are not properly joined, or who are nominal parties or remain un-served, need not consent to

23  removal. 28 U.S.C. § 1332; Hewitt v. City of Stanton, 798 F.2d 1230, 1232 (9th Cir. 1986); Salveson

24  v. W. States Bankcard Assoc., 731 F.2d 1423, 1429 (9th Cir. 1984).

25

26  [4] Id. at ¶ 9.

27  [5] Id. at ¶ 10.

28                                           4

133393V3

### PLAINTIFFS HAVE IMPROPERLY JOINED NEGLIGENCE CLAIMS AGAINST ASHLEY & MCMULLEN WITH PRODUCTS-LIABILITY CLAIMS AGAINST GUIDANT

**A.    Defendants Ashley & McMullen-Wing Sun Mortuary and Ashley & McMullen Are Improperly Joined.**

19.    Federal Rule of Civil Procedure 21 provides that "[p]arties may be dropped or added by order of the court . . . at any stage of the action and on such terms are just." Courts may sever misjoined parties when their claims do not arise out of the same transaction, occurrence, or series of transactions or occurrences, and the claims will not involve a question of law or fact common to all parties. *Hamilton v. Signature Flight Support Corp.*, No. C-05-490 CW, 2005 WL 1514127, at *3 (N.D. Cal. June 21, 2005); *In re Diet Drugs Prods. Liab. Litig.*, MDL No. 1203, No. Civ. A. 04-20099, 2004 WL 2095451, at *1 (E.D. Pa. Sept. 20, 2004) (citing, *inter alia*, Fed. R. Civ. P. 20).

20.    Where plaintiffs have improperly joined parties in a lawsuit pursuant to Rule 20,[6] courts have severed the claims against the misjoined parties to preserve a removing party's right to removal. *See, e.g., In re Rezulin Prod. Liab. Litig.*, No. 00 Civ. 2843, 2003 WL 21276425, at *1-2 (S.D.N.Y. June 2, 2003); *Tapscott v. MS Dealer Serv. Corp.*, 77 F.3d 1353, 1360 (11th Cir. 1996).

21.    Here, Plaintiffs have misjoined Ashley & McMullen because their negligence claims against Ashley & McMullen are both factually and legally distinct from the products-liability claims against Guidant.

22.    Plaintiffs' decedent, Raymond Saad, was allegedly implanted with a Guidant pacemaker/defibrillator ("ICD") on October 7, 2004.[7] He died on October 30, 2005 allegedly from heart failure that Plaintiffs contend was caused by the Guidant ICD.[8] According to the Complaint, at Plaintiff Seta Saad's direction, her husband's body was allegedly transported to a mortuary owned and operated by Ashley & McMullen.[9] The Complaint alleges Mrs. Saad gave a Guidant

---

[6] Federal Rule of Civil Procedure 20 relates to the "permissive joinder" of parties. "All persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action...." Fed. R. Civ. P. 20(a).

[7] Compl. at ¶ 2.

[8] *Id.* at ¶¶ 2 & 97.

[9] *Id.* at ¶ 98.

NOTICE OF REMOVAL

133393V3

1    representative permission to do a "non-invasive test or reading" of the ICD, but only in her

2    presence.[10] The Complaint further alleges the testing or reading of the device occurred without Mrs.

3    Saad's prior knowledge and without her presence, and the device was later removed without her

4    permission.[11]

5        23.   Plaintiffs' legal claims against Guidant are completely separate from their legal

6    claims against Ashley & McMullen. Plaintiffs state only negligence and negligent infliction of

7    emotional distress claims against Ashley & McMullen.[12] In contrast, Plaintiffs bring a wrongful

8    death and survival action against Guidant, alleging 14 separate claims: (1) design and/or

9    manufacturing defect-strict liability; (2) failure to warn-strict liability; (3) negligence; (4) negligence

10   per se; (5) breach of implied warranty; (6) breach of assumed contractual warranty obligations; (7)

11   fraud; (8) constructive fraud; (9) negligent infliction of emotional distress; (10) intentional infliction

12   of emotional distress; (11) gross negligence/malice; (12) unfair competition and unfair business

13   practices; (13) conversion; and (14) loss of consortium.[13]

14       24.   Plaintiffs' claims are factually separable as well. Plaintiffs' claims against Ashley &

15   McMullen arise from the alleged breach of duty of care that Ashley & McMullen owed to Plaintiffs

16   based on acts or omissions that occurred while the decedent's body was in the mortuary's

17   possession.[14] *See Christensen v. Superior Court*, 54 Cal. 3d 868, 901 (1991) (discussing a

18   mortuary's duty of care to provide respectful and dignified treatment of a corpse). In contrast,

19   Plaintiffs' primary claims against Guidant arise from the alleged breach of duty of care that Guidant

20   owed to Plaintiffs' decedent and involve the design, testing, manufacture, sale, and function of the

21   device at issue in Plaintiffs' Complaint.[15]

22       25.   The evidence on these claims will also be separate—evidence regarding the

---

[10] *Id.*

[11] *Id.* at ¶¶ 99–101.

[12] *Id.* at ¶¶ 137-144 & 177-182.

[13] *Id.* at ¶¶ 102-136, 145-176, & 183-228.

[14] *Id.* at ¶¶ 137-144 & 177-182.

[15] *Id.* at ¶¶ 102-136, 145-176, 183-204, & 212-218.

28                                        6                          NOTICE OF REMOVAL

133393V3

1  development, manufacture, testing, etc. of Plaintiffs' decedent's ICD on one hand, and evidence

2  regarding Ashley & McMullen's treatment of Plaintiffs' decedent's body on the other. *See Crockett*

3  *v. R.J. Reynolds Tobacco Co., et al.*, 436 F.3d 529, 533 (5th Cir. 2006) (agreeing with the state

4  court's severance of medical negligence claims against health care defendants from product liability

5  claims against product manufacturer because the burdens of proof to establish the claims are "totally

6  different"); *Greene v. Wyeth*, 344 F. Supp. 2d 1674, 1683 (D. Nev. 2004) (severing medical-

7  malpractice claims against non-diverse doctor who prescribed Fen-phen from the product liability

8  claims against the manufacturer because the claims were improperly joined).

9       26.     This Court has the discretion to remand the claims against Ashley & McMullen and

10  retain jurisdiction over the claims against Guidant. *See* Fed. R. Civ. P. 21. Guidant urges that this

11  Court sever Plaintiffs' claims against Ashley & McMullen, and that those claims either be dismissed

12  without prejudice or remanded, while the claims against Guidant remain in federal court.

13       27.     Courts may also sever parties for the "efficient administration of justice." *In re Diet*

14  *Drugs Prods. Liab. Litig.*, MDL No. 1203, Civ. A. 04-20099, 2004 WL 2095451, at * 1 (E.D. Pa.

15  Sept. 20, 2004) (citing *Moore's Federal Practice* § 21.02(1); *Official Comm. Of Unsecured*

16  *Creditors v. Shapiro*, 190 F.R.D. 352, 355 (E.D. Pa. 2000)). Here, the "efficient administration of

17  justice" would best be served by transferring the product liability claims asserted against Guidant to

18  the MDL Court in Minnesota.

19       28.     The JPML created MDL 1708 to coordinate pretrial activities, to avoid duplicative

20  discovery, and to promote the just and efficient conduct of the litigation. The spectrum of cases that

21  comprise MDL No. 1708 are "actions shar[ing] allegations that certain implantable defibrillator

22  devices manufactured by Guidant were defective and caused injury, or the threat of injury, to the

23  plaintiffs . . . ." Transfer Order, *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*,

24  Docket No. 1708 (J.P.M.L. Nov. 7, 2005) ("JPML Transfer Order").

25       29.     Because Plaintiffs assert allegations against Guidant that are similar to those in the

26  more than 2,000 cases transferred to MDL 1708, discovery in this case would be duplicative and a

27  hardship on Guidant if this case is not transferred. Upon transfer, Plaintiffs will have access to the

28                              7                         NOTICE OF REMOVAL

133393V3

1     more than 14 million pages of documents have already been produced in the MDL. Thus, Plaintiffs'

2     action belongs in the MDL. Plaintiffs should not be allowed to avoid the MDL's jurisdiction by

3     improperly joining in-state defendants.

4           30.     Upon severance of Ashley & McMullen from this action, this Court has diversity

5     jurisdiction over the remaining defendants in this action pursuant to 28 U.S.C. § 1332.

6       **B.**     **Similar Attempts to Avoid The MDL By Other California Plaintiffs Have Failed.**

7           31.     Here, Plaintiffs join the non-diverse defendants, Ashley & McMullen, in an attempt

8     to avoid transfer to the MDL. Similarly, in at least 20 other California products-liability cases

9     against Guidant, the plaintiffs unsuccessfully attempted to defeat removal and avoid transfer to the

10    MDL by fraudulently or misjoining negligence claims against resident hospitals. Nearly all of the 20

11    cases were removed to federal district court and transferred to the MDL over the plaintiffs'

12    objections.[16] *See, e.g., Brown v. Guidant Corp. et al.,* C 07-00409 JF (MDL-1708) (D. Minn.) (order

13    denying plaintiff's motion to remand as to Guidant and another non-resident defendant, and severing

14    and remanding misjoined claims against resident doctor).[17]

15                                   **AMOUNT IN CONTROVERSY**

16           32.     The amount in controversy in this case exceeds $75,000, excluding interest and costs.

17    A defendant can establish the amount in controversy by the allegations in a complaint, or by setting

18    forth facts in the notice of removal that demonstrate that the amount in controversy exceeds $75,000.

---

19    [16] *See* (Central District) *Barriga v. Guidant Corp. et al.,* CV06-5113 AHS (MLGx); *Dill v. Guidant*

20    *Corp. et al.,* EDCV06-909 VAP (CTx); *Frayer v. Guidant Corp. et al.,* CV06-5178 AHS (MLGx); *Johnson v. Guidant Corp. et al.,* SACV06-0754 CJC (MLGx); *Roberts v. Guidant Corp. et al.,*

21    CV06-5114 AHS (MLGx); *Russo v. Guidant Corp. et al.,* SACV06-766 JVS (RNBx); *Smith v. Guidant Corp. et al.,* SACV06-767 JVS (ANBx); *Smith-Toscano v. Guidant Corp. et al.,* SACV06-

22    0753 AHS (MLGx); (Eastern District) *Biondi et al. v. Guidant Corp. et al.,* 1:06 CV 01150 AWI DLB; *Everett v. Guidant Corp.,* CV F 06-01116 AWI LJO; *Notestine v. Guidant Corp. et al.,* 2:06

23    CV 01945 WBS DAD; *Hosler et al. v. Guidant Corp. et al.,* 2:06-CV-01972 FCD KJM; *Cameron et al. v. Guidant Corp. et al.,* 2:06-cv-01960 FCD DAD; (Northern District) *Kocol v. Guidant Corp. et*

24    *al.,* C-06-06537 JF; *Martinez et al. v. Guidant Corp. et al.,* CV 06-05244 JW; *McConville et al. v. Guidant Corp. et al.,* 4:06-cv-05151 WDB; *Nelsen v. Guidant Corp. et al.,* CV 06-05170 PJH;

25    (Southern District) *Hardson v. Guidant Corp. et al.,* 06 CV 1687; *Seeger v. Guidant Corp. et al.,* 06 CV 1685; *Shipley v. Guidant Corp. et al.,* 06 CV 1688. *But see Werner v. Guidant Corp.,* et al., No.

26    Case No. LC073786 (Cal. Sup. Ct.) (remanded to state court).

27    [17] A true and correct copy of the order severing and remanding misjoined claims against resident defendant is attached as Exhibit B.

28                              8                          NOTICE OF REMOVAL

1    *Green v. Party City Corp.*, No. CV-01-09681, 2002 WL 553219, at *2 (C.D. Cal. 2002) (noting that

2    if the complaint is silent on the amount of damages claimed, the court may consider facts in the

3    removed petition); *Gaus v. Miles, Inc.*, 980 F.2d 564, 576 (9th Cir. 1992).

4         33.    The face of the complaint makes clear that Plaintiffs seek damages in excess of

5    $75,000. Plaintiffs bring a wrongful death and survival action with 14 claims against Guidant alone.

6    Also, Plaintiffs' prayer for relief includes requests for compensatory damages, restitution and

7    disgorgement of profits, attorneys' fees and costs, and such other relief as the Court deems just and

8    proper.[18]

9         34.    Complaints seeking damages such as those alleged by Plaintiffs have been held to

10   establish, on their face, that the amount in controversy exceeds the jurisdictional requirement. *See,*

11   *e.g., Quinn v. Kimble*, 228 F. Supp. 2d 1038 (E.D. Mo. 2002) (holding that the amount in

12   controversy was satisfied where plaintiff sought compensation for past and future medical expenses,

13   lost wages, and damages for loss of enjoyment of life); *In re Rezulin Prods. Liab. Litig.*, 133 F.

14   Supp. 2d 272, 296 (S.D.N.Y. 2001) (holding that the amount in controversy was satisfied where

15   plaintiffs alleged economic loss, medical and health expenses, and serious medical conditions).

16        35.    Plaintiffs also seek punitive damages,[19] which are included in the calculation of the

17   amount in controversy. *See Bell v. Preferred Life Assurance Soc'y*, 320 U.S. 238, 240 (1943).

18        36.    The totality of these factors establishes that the amount in controversy meets the

19   jurisdictional requirement.

**CONCLUSION**

21        37.    Pursuant to 28 U.S.C. § 1446 (d), a copy of this Notice of Removal is being filed with

22   the clerk of the Superior Court of California, County of San Francisco.

23        38.    Pursuant to 28 U.S.C. § 1446 (d), Guidant is providing written notice to Plaintiffs.

24        WHEREFORE, Guidant Corporation, Guidant Sales Corporation, Cardiac Pacemakers, Inc.

25   and Boston Scientific Corporation hereby remove the action now pending against them in the

26   ―――――――――――――

[18] Compl. at Prayer, p. 37.

27   [19] *Id.*

28                                                    9                                   NOTICE OF REMOVAL

133393V3

1  Superior Court of the State of California, County of San Francisco, to this Honorable Court, and

2  request that this Court retain jurisdiction for all further proceedings.

3

4  DATED: January 4, 2008                    Respectfully submitted,

5

6                                            SHOOK, HARDY & BACON L.L.P.

7                                            By: _Sara J. Romano_

8                                                DANA N. GWALTNEY
                                                 SARA J. ROMANO

9

10                                           Attorneys for Defendants GUIDANT
                                             CORPORATION, GUIDANT SALES
                                             CORPORATION, CARDIAC PACEMAKERS,
11                                           INC. and BOSTON SCIENTIFIC CORPORATION

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                              10                         NOTICE OF REMOVAL

133393V3

**EXHIBIT A**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

NOV - 7 2005

*RELEASED FOR PUBLICATION*

FILED
CLERK'S OFFICE

*DOCKET NO. 1708*

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

## IN RE GUIDANT CORP. IMPLANTABLE DEFIBRILLATORS PRODUCTS LIABILITY LITIGATION

## BEFORE WM. TERRELL HODGES, CHAIRMAN, JOHN F. KEENAN, D. LOWELL JENSEN, J. FREDERICK MOTZ, ROBERT L. MILLER, JR., KATHRYN H. VRATIL AND DAVID R. HANSEN, JUDGES OF THE PANEL

### TRANSFER ORDER

This litigation currently consists of two actions in the District of Minnesota and one action each in the Central District of California, Southern District of Florida, Southern District of Indiana and Eastern District of New York as listed on the attached Schedule A.[1] Before the Panel are two motions, pursuant to 28 U.S.C. § 1407, that taken together seek centralization for coordinated or consolidated pretrial proceedings of the six actions. Plaintiff in one District of Minnesota action and plaintiff in the Southern District of Indiana action both seek centralization in the district in which their respective actions are pending. Defendants Guidant Corp., Guidant Sales Corp., and Cardiac Pacemakers, Inc. (collectively Guidant) initially opposed the motions, but now agree that centralization is warranted; however, the defendants propose the Northern District of Illinois as transferee district. Plaintiffs in all actions before the Panel agree that centralization is appropriate, as do plaintiffs in numerous potential tag-along actions, but some responding plaintiffs suggest transferee districts other than those proposed by the movants and Guidant, including the Northern District of California, Southern District of Florida, Eastern District of New York, Northern District of Ohio, and Eastern District of Pennsylvania, among others.

On the basis of the papers filed and hearing session held, the Panel finds that these six actions involve common questions of fact, and that centralization under Section 1407 in the District of Minnesota will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation. These actions share allegations that certain implantable defibrillator devices manufactured by Guidant were defective and caused injury, or the threat of injury, to the plaintiffs and putative class members. Plaintiffs in some potential tag-along actions also bring claims related to pacemakers manufactured by Guidant. All devices at issue in these actions have been the subject of

---

[1] The Panel has been notified of over 60 potentially related actions pending in multiple federal districts. In light of the Panel's disposition of this docket, these actions will be treated as potential tag-along actions. *See* Rules 7.4 and 7.5, R.P.J.P.M.L., 199 F.R.D. 425, 435-36 (2001).

NOV 10 2005

CL CAFA-123648
20-4-

- 2 -

written warnings, medical advisories, recalls, or some combination thereof. Centralization under Section 1407 is necessary in order to eliminate duplicative discovery; prevent inconsistent pretrial rulings, especially with respect to class certification; and conserve the resources of the parties, their counsel and the judiciary.

Given the varied locations of parties and witnesses in this docket and the geographic dispersal of pending actions, it is clear that a wide array of suitable transferee districts presents itself. In concluding that the District of Minnesota is an appropriate forum for this docket, we observe that this district, where at least ten actions are already pending before one judge, is a geographically central, metropolitan district equipped with the resources that this complex products liability litigation is likely to require. The District of Minnesota also has a nexus to this docket given the location there of key Guidant facilities involved in the development and manufacturing of the relevant devices.

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, the actions listed on Schedule A and pending outside the District of Minnesota are transferred to the District of Minnesota and, with the consent of that court, assigned to the Honorable Donovan W. Frank for coordinated or consolidated pretrial proceedings with the actions listed on Schedule A and pending in that district.

FOR THE PANEL:

Wm. Terrell Hodges
Chairman



# SCHEDULE A

**MDL-1708 -- In re Guidant Corp. Implantable Defibrillators Products Liability Litigation**

### Central District of California

*Joseph Gabriele v. Guidant Corp.*, C.A. No. 5:05-487

### Southern District of Florida

*Eugene Clasby v. Guidant Corp.*, C.A. No. 1:05-21485

### Southern District of Indiana

*John Brennan v. Guidant Corp., et al.*, C.A. No. 1:05-827

### District of Minnesota

*Edith Walker v. Guidant Corp.*, C.A. No. 0:05-1141
*Darci L. Munson v. Guidant Corp., et al.*, C.A. No. 0:05-1153

### Eastern District of New York

*Larry Wenig, et al. v. Guidant Corp., et al.*, C.A. No. 2:05-2822

**EXHIBIT B**

# SUMMONS
## (CITACION JUDICIAL)

SUM-100

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
GUIDANT CORPORATION; GUIDANT SALES CORPORATION;
CARDIAC PACEMAKERS, INC.; BOSTON SCIENTIFIC
CORPORATION; ASHLEY & MCMULLEN-WING SUN MORTUARY, a
business entity form unknown; ASHLEY & MCMULLEN, a
business entity form unknown; and DOES 1 through 20,
inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
SETA SAAD and CHRISTIAN E. SAAD, individually and as
representatives of the Estate of Raymond Saad,

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| The name and address of the court is: *(El nombre y dirección de la corte es):* | CASE NUMBER: *(Número del Caso):* CGC-07-468614 |
|---|---|

Superior Court
400 McAllister Street

San Francisco, CA 94102-4514
Civil

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Donald Edgar (139324) - Jeremy Fietz (200396)    707-545-3200    707-578-3040
EDGAR LAW FIRM
408 College Avenue
Santa Rosa, CA  95401

| DATE: *(Fecha)* OCT 2 9 2007   Gordon Park-1 | Clerk, by *(Secretario)* Jun Panelo | , Deputy *(Adjunto)* |
|---|---|---|

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* GUIDANT CORPORATION

   under: ☒ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized p)
          ☐ other *(specify):*
4. ☒ by personal delivery on *(date):* 12/1/07  12/5/07

[SEAL]

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Code of Civil P

Legal
Solutions
& Plus

ENDORSED
F I L E D
San Francisco County Superior Court

OCT 2 9 2007

GORDON PARK-LI, Clerk
BY: _____ JUN P. PANELO
Deputy Clerk

1  Donald S. Edgar, Esq. (State Bar No. 139324)
   Jeremy R. Fietz, Esq. (State Bar No. 200396)
2  Rex Grady, Esq. (State Bar No. 232236)
   *THE EDGAR LAW FIRM*
3  408 College Ave
   Santa Rosa, CA 95401
4  Telephone:  (707) 545-3200
   Facsimile:  (707) 578-3040
5
   Attorneys for all Plaintiffs
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CASE MANAGEMENT CONFERENCE SET**

**MAR 2 8 2008 -9ᵒᵒ AM**

**DEPARTMENT 212**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN FRANCISCO

SETA SAAD and CHRISTIAN E. SAAD, individually and as representatives of the Estate of RAYMOND SAAD,

        Plaintiffs,

    v.

GUIDANT CORPORATION; GUIDANT SALES CORPORATION; CARDIAC PACEMAKERS, INC.; BOSTON SCIENTIFIC CORPORATION, ASHLEY & MCMULLEN-WING SUN MORTUARY, a business entity form unknown; ASHLEY & MCMULLEN, a business entity form unknown; and DOES 1 through 20, inclusive,

        Defendants.

CASE NO.: **CGC-07-468614**

UNLIMITED CIVIL

**COMPLAINT FOR DAMAGES, RESTITUTION, and INJUNCTIVE RELIEF**

## INTRODUCTION

1.    Plaintiffs, by their undersigned counsel, individually and in their representative capacities, hereby bring this Complaint against Defendants GUIDANT CORPORATION ("Guidant Corp."), GUIDANT SALES CORPORATION ("Guidant Sales"), CARDIAC PACEMAKERS, INC. ("CPI") and BOSTON SCIENTIFIC CORPORATION ("Boston Scientific") (all hereinafter collectively referred to as "Defendants" or "Guidant" or "Guidant Defendants"), ASHLEY &

-1-

1  MCMULLEN-WING SUN MORTUARY, ASHY & MCMULLEN, and DOES 1 through 20, for

2  compensatory, equitable, and injunctive relief. Plaintiffs make the following allegations based upon

3  their personal knowledge with respect to their own acts, and, upon information and belief, as well

4  as upon their respective attorneys' investigative efforts, as to the actions and misconduct of

5  GUIDANT, ASHLEY & MCMULLEN-WING SUN MORTUARY and ASHLEY & MCMULLEN.

6                                          **PARTIES**

7       2.      Plaintiff RAYMOND SAAD was a citizen and resident of the State of California. Mr.

8  Saad had a severe cardiovascular condition that necessitated the use of an implantable cardiac

9  pacemaker/defibrillator. On or about October 7, 2004, Mr. Saad was implanted with a Guidant

10  Contak Renewal cardiac resynchronization therapy defibrillator, also known as the "CRT-D," or the

11  "Model H135." On or about October 30, 2005, Mr. Saad died of heart failure.

12      3.      Plaintiff SETA SAAD is a citizen and resident of the State of California. She is the

13  widow and successor-in-interest of RAYMOND SAAD.

14      4.      Plaintiff CHRISTIAN E. SAAD is a citizen and resident of the State of California.

15  He is the son and successor-in-interest of RAYMOND SAAD.

16      5.      Defendant GUIDANT CORP. is an Indiana corporation, with its principal place of

17  business at 111 Monument Circle, 29th Floor, Indianapolis, Indiana. Guidant Corp. develops

18  technology to treat conditions such as heart disease, neurological disorders, and vascular illness.

19  Guidant's CRM Division is the division that develops, researches, advertises, promotes, markets,

20  and sells all of Guidant's ICDs, some of which are marketed under the trade names Ventak Prizm,

21  Contak Renewal, and Vitality. CRM Division's operations are principally conducted out of its

22  facilities at 4100 Hamline Avenue North, St. Paul, Minnesota.

23      6.      Defendant GUIDANT CORP. sells its ICDs and pacemakers through its wholly-

24  owned subsidiary, Defendant GUIDANT SALES CORPORATION. Guidant Sales is an Indiana

25  corporation, with its principal place of business at 111 Monument Circle in Indianapolis, Indiana.

26      7.      Defendant CARDIAC PACEMAKERS, INC., a Minnesota corporation, developed

27  Guidant's ICDs and pacemakers. CPI was merged into Guidant in or about September 1994, and is

28  now a wholly-owned subsidiary of Guidant Corp., with headquarters at 4100 Hamline Ave. North,

St. Paul, Minnesota.

8.     Defendant BOSTON SCIENTIFIC describes itself as a worldwide developer, manufacturer, and marketer of medical devices, whose products are used in a broad range of interventional medical specialties with reported revenue of $6.3 billion in 2005. Boston Scientific is incorporated in the State of Delaware with its principal executive office located in Natick, Massachusetts. In January 2006, Boston Scientific entered into an agreement to acquire Guidant Corp. and its subsidiaries for approximately $27 billion. Pending final approval of that merger, which has been approved by Guidant 's stockholders, Boston Scientific is the successor in interest to Guidant and, directly or indirectly, has assumed Guidant's liabilities in this litigation.

9.     Defendant ASHLEY & MCMULLEN-WING SUN MORTUARY is a business entity, form unknown, that operates a mortuary located at 4200 Geary Boulevard, San Francisco, CA 94118.

10.     Defendant ASHLEY & MCMULLEN is a business entity, form unknown, that operates the aforementioned mortuary, located at 4200 Geary Boulevard, San Francisco, CA 94118.

11.     Plaintiffs are ignorant of the true names and capacities of those Defendants named as DOES 1 through 20 (hereinafter "Doe Defendants"), and for that reason have sued these Defendants by fictitious names. Plaintiffs are informed and believe, and on that basis allege, that each of the fictitiously named Defendants are in some way liable and legally responsible for the damages and injuries set forth in this Complaint. Plaintiffs will seek leave of the Court to amend this Complaint to identify these Defendants when their identities are determined.

12.     In doing the things alleged in this Complaint, Defendants acted as the agents, servants, employees and alter-egos of their Co-Defendants. Defendants acted within the course and scope of their agency and employment, and acted with knowledge, consent and approval of their Co-Defendants. Their conduct was approved and ratified by their Co-Defendants.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over all causes of action asserted in this Complaint pursuant to the *California Constitution*, Article VI, § 10, because this case is a cause of action not assigned by statute to other trial courts.

14.     This Court has jurisdiction over each Defendant named in this Complaint because

COMPLAINT

- 3 -

1  each Defendant is an individual who is either domiciled in California or has sufficient minimum

2  contacts with California so as to render the exercise of jurisdiction by this Court permissible under

3  traditional notions of fair play and substantial justice.

4      15.    Venue is proper in this Court in accordance with *California Code of Civil Procedure*

5  § 395 (a), because the injuries complained of in this Complaint were injuries to a person or persons,

6  and were also injuries leading to death from a wrongful act or negligence, and said injuries occurred

7  either entirely or substantially in the County where this Court sits.

8      16.    The relief sought by each individual Plaintiff is within the jurisdictional limits of this

9  Court.

10  ### FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS

11  ### I. GUIDANT CORPORATE STRUCTURE

12      17.    Guidant Corp. and its wholly-owned subsidiaries, Guidant Sales and CPI, design,

13  research, develop, manufacture, test, market, advertise, promote, distribute, and sell products that

14  treat cardiac arrhythmias, heart failure, and coronary and peripheral vascular disease. Guidant

15  Corp.'s core biomedical businesses are divided into four divisions: Cardiac Rhythm Management,

16  Cardiac Surgery, Endovascular Solutions, and Vascular Intervention.

17      18.    Guidant Corp.'s products are sold through a combined sales organization, Guidant

18  Sales.

19      19.    Guidant Corp.'s business units present themselves under the "Guidant" corporate

20  banner to the general public, including to the Food and Drug Administration ("FDA"), physicians,

21  and individuals. As the Independent Panel that reviewed Guidant Corp.'s device surveillance and

22  disclosure policies concluded, "the public views Guidant Corporation as a single entity, rather than

23  a group of individual businesses." (See *Independent Panel Report*, at p. 16). Guidant Corp.

24  promotes such a view by, among other things, including the Guidant logo on all device marketing

25  materials.

26      20.    Guidant Corp.'s business units have their own officers but are also tied together at

27  the corporate level by a structure by which Guidant Corp. oversees the business units, including

28  through the Guidant Management Committee.

COMPLAINT

- 4 -

21.    The products of Guidant Corp.'s CRM Division include ICDs, pacemakers, and lead systems. ICDs are implanted medical devices used to detect and treat abnormally fast and irregular heart rhythms, each of which can stop or hinder the heart from pumping blood effectively throughout the body and can result in sudden cardiac death. Pacemakers are medical devices used to detect and treat abnormally slow heart rhythms.

22.    Guidant holds itself out as "the world leader in the design and development of cardiovascular medical products." (See Guidant Corp., Corporate Overview, http://www. Guidant.com/about_us.shtml). ICDs have been Guidant Corp.'s fastest growing product for at least the last three years. The first ICD was placed on the market in 1985 by CPI, now wholly-owned by Guidant Corp. Between 2002 and 2004, Guidant Corp.'s revenues for sales of ICDs jumped 80% to $1.786 billion.

## II.  OVERVIEW OF IMPLANTABLE DEVICES FOR CARDIAC RHYTHM MANAGEMENT

23.    Cardiovascular disease is the leading cause of death for both men and women in the United States. Implantable devices for cardiac rhythm management have become an integral part of cardiovascular therapy. Implantable pacemakers for individuals with bradycardia (a slow heartbeat) were introduced more than 40 years ago, and the first ICD was implanted in 1980. (As used hereinafter, the term "Implantable Device" will refer to pacemakers and/or ICDs manufactured and sold by Defendants.). Thereafter, specialized pacemakers called cardiac resynchronization devices that improve the mechanical function of the heart were introduced and combined with existing ICD technology. Today, Implantable Devices are also commonly used for treatment of arrhythmia (an irregular heartbeat).

24.    There has been explosive growth in ICD use. There are now, in just the United States, well over one million individuals living with an implanted cardiac rhythm device and this number is increasing rapidly. In 2005, approximately 200,000 people in the United States were implanted with ICDs.

25.    The ICDs designed, manufactured and distributed into the stream of commerce by Guidant consist of three components: (1) a small rectangular generator, approximately two inches

1  wide, which is implanted under the skin just below the collarbone; (2) insulated wires– or leads–

2  which are attached to the generator and threaded through a vein to the heart, to carry the electric

3  current from the generator; and (3) two electrodes, located at the tip of each lead, which deliver an

4  electric shock to the heart.

5       26.    The purpose of the ICD is to correct abnormal heart rhythm. The ICD can generate

6  a series of precisely timed, low-intensity, electrical pulses to reset the heart to normal rhythm when

7  the heart beats faster than normal (tachycardia); or the ICD can deliver sudden shocks to the heart

8  to stop potentially fatal heart quivering (ventricular fibrillation). In addition, the ICD may be

9  programmed as a pacemaker to send small electric signals if the heart beats too slowly (bradycardia).

10       27.    Implantable CRT-D devices are medical devices that treat heart failure by helping the

11  lower chamber (ventricles) pump synchronously with the upper chambers (atria), while preventing

12  the heart from beating too slowly (bradycardia) and shocking or "over-drive pacing" of heartbeat

13  rhythms that are too fast (a process by which the CRT-D is paced briefly at a rhythm faster than the

14  desired rhythm in order to recapture control of the heartbeat).

15       28.    All ICDs function as both pacemakers and defibrillators. The ICD can detect and

16  correct both fast and slow heart rates. The ICD corrects the slow rates and can "over-drive pace"

17  rapid rates and it also can administer shocks to treat ventricular tachycardia and ventricular

18  fibrillation.

19       29.    ICDs are used in individuals, like Plaintiffs, who have arrhythmias or irregular

20  heartbeats that are considered life-threatening. These can include individuals with ventricular

21  fibrillation (rapid, ineffective contraction of the ventricles of the heart), ventricular tachycardia

22  (excessively rapid heartbeat) that is poorly controlled by medication, or significant thickening of the

23  heart muscle resulting in arrhythmia. Such conditions can result in the loss of consciousness or

24  death, unless the affected individual receives therapy from an appropriate device to put the heart

25  back into a normal cardiac rhythm. Pacemakers are used in individuals, like Plaintiffs, who have

26  bradycardia that is uncontrolled by medicine alone.

27       30.    If an implanted ICD operates properly, it can save an individual's life. If it fails to

28  operate properly, the individual could die within minutes.

31.    Since 1958, pacemakers have been sold for implantation in individuals who have had certain spontaneous and/or inducible life-threatening arrhythmias, bradycardia, heart block, and congestive heart failure and those who are at high risk of developing bradycardia, heart block, or arrhythmias. Pacemakers are used to manage disorders that disrupt the heart's normal electrical conduction system.

32.    Pacemakers are designed to be implanted under the skin of the chest wall. The device's power source (pulse generator) is implanted in a pouch formed under the collarbone, just under the skin, usually on the upper left chest. Wires, called leads, are inserted through a blood vessel and attached directly into the heart. These wires, which are connected to the pacemaker or pulse generator, are capable of both sensing a problematic heart rate and stimulating a more appropriate heart rate.

33.    Some individuals are very dependent on pacemakers to maintain an adequate heart rate, and therefore, cardiac output. For these individuals, failure of the cardiac pacemaker to provide pacing can cause sudden faintness, or loss of consciousness, and can result in death.

34.    At all times relevant, Guidant misrepresented the safety of its ICDs and pacemakers and negligently manufactured, marketed, advertised, promoted, sold, and distributed those ICDs and pacemakers as safe devices to be used for treatment of individuals with prior myocardial infarction, arrhythmias, and individuals who are at high risk for developing such arrhythmias.

### III. THE DEVICE AT ISSUE

35.    As detailed below, this Complaint seeks recovery for injuries arising from the implantation of Guidant's Contak Renewal 1 Model H135, hereinafter referred to as the "H135 Device" or the "Device." The H135 Device is a heart regulating device, or defibrillator.

### IV. THE FEDERAL REGULATORY SCHEME GOVERNING DESIGN, TESTING DISTRIBUTION AND RECALL OF THE DEVICE

36.    As part of the conditions of approval for the Device, Defendants must ensure that no changes be made to the Device that would affect its safety or effectiveness without submission of a Pre-Market Approval ("PMA") supplement for review and approval, and that a PMA supplement

COMPLAINT                                                            - 7 -

must be submitted when a device failure necessitates a labeling, manufacturing, or device modification. Violation of such conditions voids their approval.

37. The removal of Device from the market and other corrective actions taken by Guidant have been classified as Class I or Class II recalls under federal regulations—the highest levels of such recalls.

38. Under federal regulation "[r]ecall means a firm's removal or correction of a marketed product that the Food and Drug Administration considers to be in violation of the laws it administers and against which the agency would initiate legal action, e.g., seizure." (21 C.F.R. § 7.3(g) (2006)).

39. The classification of a recall as Class I, II, or III "indicate[s] the relative degree of health hazard presented by the product being recalled."(Id. § 7.3(m)). "Class I is a situation in which there is a reasonable probability that the use of, or exposure to, a violative product will cause serious adverse health consequences or death." (Id. § 7.3 (m)(1)). "Class II is a situation in which use of, or exposure to, a violative product may cause temporary or medically reversible adverse health consequences or where the probability of serious adverse health consequences is remote." (Id. § 7.3 (m)(2)).

40. A device is deemed to be adulterated if, among other things, it fails to meet established performance standards, or if the methods, facilities, or controls used for its manufacture, packing, storage, or installation are not in conformity with federal regulations. (See 21 U.S.C. § 351 (2006)).

41. A device is deemed to be misbranded if, among other things, its labeling is false or misleading in any particular way, or if it is dangerous to health when used in the manner prescribed, recommended or suggested in the labeling thereof. (See 21 U.S.C. § 352).

42. Manufacturers are required to comply with FDA regulation of medical devices, including FDA regulations relating to records and reports, in order to prohibit introduction of medical devices that are adulterated or misbranded, and to assure the safety and effectiveness of medical devices. In particular, manufacturers must keep records and make reports if any medical device may have caused or contributed to death or serious injury, or if the device has malfunctioned in a manner likely to cause or contribute to death or serious injury. Federal law also mandates that

1  the FDA establish regulations requiring a manufacturer of a medical device to report promptly to

2  FDA any correction or removal of a device undertaken to reduce a risk to health posed by the device,

3  or to remedy a violation of federal law by which a device may present a risk to health. (See 21

4  U.S.C. § 360i).

5        43.    Adverse events associated with a medical device must be reported to FDA within 30

6  days after the manufacturer becomes aware that a device may have caused or contributed to death

7  or serious injury, or that a device has malfunctioned and would be likely to cause or contribute to

8  death or serious injury if the malfunction was to recur. Such reports must contain all information

9  reasonably known to the manufacturer, including any information that can be obtained by analysis,

10  testing, or other evaluation of the device, and any information in the manufacturer's possession. In

11  addition, manufacturers are responsible for conducting an investigation of each adverse event, and

12  must evaluate the cause of the adverse event. (See 21 C.F.R. § 803.50).

13        44.    Manufacturers of medical devices must also describe in every individual adverse

14  event report whether remedial action was taken in regard to the adverse event, and whether the

15  remedial action was reported to the FDA as a removal or correction of the device. (See 21 C.F.R. §

16  803.52).

17        45.    Manufacturers must report to the FDA in five business days after becoming aware

18  of any reportable medical device reporting ("MDR"). MDR events require the manufacturer to

19  conduct a trend analysis that necessitates remedial action to prevent an unreasonable risk of

20  substantial harm to public health. (See 21 C.F.R. § 803.53).

21        46.    Device manufacturers must report promptly to the FDA any device corrections and

22  removals, and maintain records of device corrections and removals. FDA regulations require

23  submission of a written report within ten working days of any correction or removal of a device

24  initiated by the manufacturer to reduce a risk to health posed by the device, or to remedy a violation

25  of federal law caused by the device that may present a risk to health. The written submission must

26  contain, among other things, a description of the event giving rise to the information reported and

27  the corrective or removal actions taken, and any illness or injuries that have occurred with use of the

28  device, including reference to any device report numbers. Manufacturers must also indicate the total

COMPLAINT

- 9 -

1    number of devices manufactured or distributed which are subject to the correction or removal, and

2    provide a copy of all communications regarding the correction or removal. (*See* 21 C.F.R. § 806.10).

3        47.    Manufacturers must comply with quality system regulations that require

4    manufacturers to meet design-control requirements, including but not limited to conducting design

5    validation to ensure that devices conform to defined user needs and intended uses. Manufacturers

6    must also meet quality standards in manufacture and production. Manufacturers must establish and

7    maintain procedures for implementing corrective actions and preventive actions, and investigate the

8    cause of nonconforming product and take corrective action to prevent recurrence. Manufacturers are

9    required to review and evaluate all complaints and determine whether an investigation is necessary.

10    Manufacturers are also required to use statistical techniques where necessary to evaluate product

11    performance. (*See generally* 21 C.F.R. § 820).

12        48.    A manufacturer must report to the FDA through a PMA supplement any new

13    indications for use of a device, labeling changes, or changes in the performance or design

14    specifications, circuits, components, ingredients, principle of operation, or physical layout of the

15    device. A manufacturer may implement changes to a device that enhance the safety of the device

16    prior to obtaining FDA approval, if the manufacturer submits a special report entitled: "Special PMA

17    Supplement -Changes Being Effected" and provides a full explanation of any labeling changes or

18    changes in quality control or manufacturing process that add a new specification of test method, or

19    otherwise provide additional assurance of purity, strength, or reliability of the device.

20        49.    Federal regulations require that: "A PMA supplement must be submitted when

21    unanticipated adverse effects, increases in the incidence of anticipated adverse effects, or device

22    failures necessitate a labeling, manufacturing, or device modification." (Conditions of Approval at

23    1, attached to FDA Approval Letter from Daniel G. Schultz, Deputy Director for Clinical Policy,

24    FDA, to Kaye Anderson, Senior U.S. Regulatory Affairs Associate, Guidant Corporation (July 18,

25    2002); *see* 21 C.F.R. § 814.39).

26        50.    Guidant's failure to meet federal regulations applicable to medical devices and

27    Guidant's other acts and omissions as described herein directly and proximately caused the H135

28

COMPLAINT

- 10 -

1    Device to be in violation of federal law and unfit for sale, and proximately caused harm, injury, and,

2    in the case of Raymond Saad, death

3        51.    Plaintiffs' state law claims are based on parallel state law provisions that do not

4    conflict with federal law.

5                    **V. HISTORY OF THE DEVICE**

6        52.    As previously noted, Guidant manufactured CRT-D, also known as Contak Renewal

7    Model H135.

8        53.    In or before November 2003, Guidant became aware that the H135 Device was prone

9    to short-circuiting.

10       54.    From November 2003 to May 2005, Guidant knew of multiple instances in which the

11   H135 Device had short circuited, including that the short circuiting had resulted in at least one death.

12       55.    While Guidant knew that the H135 Device was defective, it failed to disclose the

13   defect to the FDA, the medical community, and the public, and continued to sell the H135 Device

14   with the defect. Not until September 2004 did Guidant consider stopping the sale of the defective

15   device, and even then, determined that the Guidant sales staff should misrepresent to the medical

16   community the reason for any resulting inventory back-orders in order to avoid questions that could

17   lead to explanation of existing defective device.

18       56.    In January 2005, Guidant considered withdrawing the H135 Device from the market

19   because of the defect, but concluded that Guidant would not disclose the defect or withdraw the

20   device from the market.

21       57.    On June 17, 2005, only after Guidant had been forced to disclose the defects in other

22   Guidant devices (for instance, the Ventak Prizm 2 DR 1861) and the FDA had initiated a review of

23   these other devices, did Guidant issue a letter to doctors disclosing the defective nature of the H135.

24   Specifically, as to the H135, Guidant stated that its laboratory analysis had proven that the Contak

25   Renewal 1 & 2 had failed due to "deterioration in a wire insulator within the lead connector block

26   [which,] in conjunction with other factors, could cause a short circuit and loss of device function due

27   to diversion of therapy energy away from the heart and into device circuitry." (Guidant Corp.,

28   Urgent Medical Device Safety Information & Corrective Action: Contak Renewal Model H135 and

                            COMPLAINT                              - 11 -

1  Contak Renewal 2 Model H155 Devices Manufactured on or Before August 26, 2004 at 1 (June 17,

2  2005) ("June 17 Contak Renewal 1 & 2 Letter")).

3      58.    Guidant stated that there was no way of predicting whether "any particular device will

4  fail." (*Id.* at 3). According to the June 17 Contak Renewal 1 & 2 Letter, fifteen reports of the

5  malfunction had been confirmed, at least, one of which was fatal, and approximately 16,000 of the

6  devices had been implanted worldwide. (*See id.* at 1).

7      59.    Since the June 17 Contak Renewal 1 & 2 Letter, more reports of the malfunction have

8  been confirmed by Guidant and at least three more deaths have been associated with the Contak

9  Renewal 1 & 2 defect.

10     60.    Guidant further advised physicians to consider performing a commanded shock of

11 the ICD to confirm the integrity of the high-voltage delivery system, and warned physicians that

12 Devices that had failed should be explanted and replaced with new Devices.

13     61.    Guidant also stated that, in regard to the H135 Device, it had "implemented design

14 and manufacturing corrective actions to address internal shorting within the device header. No

15 devices manufactured after August 26, 2004 have exhibited this failure." (*Id.* at 3).

16     62.    Once again, despite the fact that Guidant made manufacturing changes on or around

17 August 26, 2004, which it represented had corrected the defect in the H135 device, Guidant failed

18 to inform physicians, patients, and the public until the June 17 Contak Renewal 1 & 2 Letter.

19     63.    In June 2005, Guidant recommended that physicians assess whether to replace the

20 H135 device.    In September 2005, Guidant recommended that physicians reassess device

21 replacement "as a result of the increased projected rate of occurrence." (Guidant Corp., Advisory

22 Update: Contak Renewal and Contak Renewal 2, Models H135 and H155 (Sept. 12, 2005)).

23     64.    Guidant has stated that its estimation of the level of device malfunction in the H135

24 Device is likely to be understated because the actual number of clinical failures may be greater than

25 the number reported and its predictive modeling is inherently uncertain.

26     65.    The FDA has classified the action taken by Guidant with regard to the H135 Device

27 as a Class I recall. The recall requires Guidant to disclose the device malfunction to individuals and

28 doctors while providing additional instructions for safe use of the devices.

COMPLAINT

66.    Meanwhile, Guidant had concluded that the polyimide insulation tubing used in the H135 device was susceptible to cracking that could result in short circuiting of the device.

67.    In December 2005, the FDA reported that there had been at least five deaths associated with the defect in the H135 device and that additional clinical occurrences are likely.

68.    At all times relevant to this action, Guidant knew, and had reason to know, that the H135 Device was not safe for the individuals for whom they were prescribed and implanted, because the device malfunctioned, and therefore failed to operate in a safe and continuous manner, causing serious medical problems and, in certain individuals, catastrophic injuries and deaths.

69.    Guidant has continued to issue advisories regarding the H135 Device. Guidant's latest advisory, on March 11, 2006, stated that H135 device may exhibit a decline in battery voltage related to an unexpected sustained, low level current. (*See* Guidant Corp., Urgent Medical Device Safety Information & Corrective Action: Guidant Renewal 3 RF & Renewal 4 RF (CRT-Ds) at 1 (Mar. 11, 2006)). Although Guidant claims that the defect can only occur during storage/shipment mode prior to implant, Guidant also states that it has confirmed that the internal low level current may occur "transiently" in normal use post implant.

70.    Guidant has advised that the FDA may classify this communication regarding the H135 device as a recall.

## VI. GUIDANT'S PAST AND PRESENT ILLEGAL AND
## REPREHENSIBLE CONDUCT

### A. Guidant's Failure To Meet Basic Manufacturing & Regulatory Standards

71.    The FDA conducted an inspection of Guidant's facilities during the time period of August 22, 2005 to September 1, 2005. At the conclusion of the inspection, the FDA issued a 483 Inspection Report ("FDA 483"), in which it detailed violations of federal regulations by Guidant. (*See* FDA 483 Inspection Report (Sept. 1, 2005) ("Sept. 1 FDA 483")).

72.    The stated purpose of the FDA 483 is "to assist the firms inspected in complying with the Acts and regulations enforced by the Food and Drug Administration." (FDA 483 Inspection Report at 2 (Feb. 8, 2006) ("Feb. 8 FDA 483")).

COMPLAINT

- 13 -

73. Included in the Sept. 1 FDA 483 for Guidant were the following fifteen observations of violations noted by FDA:

(a)   procedures for conducting quality audits were incomplete;

(b)   "[n]ot all of the actions needed to correct and prevent the recurrence of nonconforming product and other quality problems have been identified;"

(c)   procedures were not completed and implemented for monitoring and controlling of process parameters for validated processes;

(d)   "[a] process whose results cannot be fully verified by subsequent inspection and test has not been validated and approved according to established procedures;"

(e)   "[p]rocedures to ensure that equipment is routinely maintained were not established;"

(f)   "[d]uring production, component and device characteristics are not fully monitored and controlled;"

(g)   "[p]rocedures for changes to methods were not complete;"

(h)   management with executive responsibility has not ensured that an adequate and effective quality system has been implemented and maintained at all levels of the organization;

(i)   "[s]oftware used as part of production and the quality system has not been fully validated for its intended use according to an established protocol," and electronic records which are used do not have requirements to ensure that they are trustworthy, reliable, and generally equivalent to paper records;

(j)   "appropriate sources of quality data are not adequately analyzed to identify existing and potential causes of nonconforming product and other quality problems;"

(k)   processes have not been approved and electronic records do not meet employee accountability/responsibility policy and signature manifestation requirements to ensure that they are trustworthy, reliable and generally equivalent to paper records;

(l)   "[t]he document control procedures do not designate an individual to review documents for adequacy and approve them prior to issuance;"

COMPLAINT

1    (m)   "[r]ework and reevaluation activities have not been documented in the device history

2           records;"

3    (n)    "[d]ocument control procedures are not complete;" and

4    (o)    the device history record does not include complete acceptance records that

5            demonstrate the device is manufactured in accordance with the device master record.

6            Feb. 8 FDA 483 at 1-6.

7      74.    The findings of the FDA inspection of August and September 2005 confirm that

8  Guidant was violating federal and state law in manufacturing the Device.

9      75.    From December 2005 to February 2006, the FDA again inspected Guidant's

10  manufacturing facilities and found further egregious violations of basic manufacturing standards

11  fundamental to federal and state law. (*See* Feb. 8 FDA 483). Specifically, the FDA found that

12  Guidant had failed to disclose the AVT device defects that it had known about since May 2002 and

13  had attempted to correct through revised software implemented by May 2004. (*See id.*).

14      76.    The FDA's inspections led to recalls of the H135 Device and specifically criticized

15  Guidant's manufacturing and disclosure processes, stating that Guidant had failed to establish

16  adequate procedures in violation of federal regulations.

17      77.    Moreover, with respect to the H135 Device, Defendants failed to comply with FDA

18  regulations and the Conditions of Approval relating to relevant PMA and PMA Supplements.

19      78.    The claims alleged herein set forth sufficient facts to establish manufacturing defects

20  with respect to the H135 Device.

21      79.    No claims alleged herein are preempted under any provisions of the Medical Device

22  Act or FDA regulations.

23      80.    Guidant's failure to meet federal regulations applicable to medical devices and

24  Guidant's other acts and omissions as described herein directly and proximately caused the Devices

25  to be in violation of federal and state law, and proximately caused harm and injury to Plaintiffs.

26

27

28

## B. Guidant's Concealment of the Device Defects

81.    Guidant's failure to disclose accurately and adequately the known defects in the H135 Device and concealment of known defects from the FDA, the medical community, and from Plaintiffs constitutes fraudulent concealment that equitably tolls applicable statutes of limitation.

82.    No Plaintiff could have discovered the existence of the short-circuit defect in the H135 Device until at least May 2005, when the first press reports regarding the defects were published.

83.    It was not until June 17, 2005, that the public was officially notified by the FDA that the agency was recalling H135 Device. At no point prior to June 17, 2005, did Guidant notify any Plaintiff, the medical community, or the public that the H135 Device was defective.

84.    Meanwhile, although Guidant regularly issued Product Performance Reports purporting to disclose information regarding the Device, it was not until late 2005 that such Product Performance Reports included any information from which a reader could discern that Guidant was aware of potentially life-threatening malfunctions that could occur in the Device.

85.    Guidant's failure to properly disclose the known defects in the H135 Device and Guidant's active concealment of the known defects from the FDA, the medical community, and Plaintiffs constitutes fraudulent concealment that equitably tolls applicable statutes of limitation.

86.    Guidant is estopped from relying on the statute of limitations defense because it actively concealed the ICD defects by suppressing reports, failing to follow through on FDA notification regulations, and failing to disclose known defects to the medical community, the public, or the Plaintiffs.

87.    Instead of revealing the defects, Guidant continued to represent the H135 Device as safe for its intended use.

88.    Guidant's conduct, as described in the preceding paragraphs, amounts to conduct that Guidant must have realized was dangerous, heedless and reckless, without regard to the consequences or to the rights and safety of Plaintiffs.

89.    At all times relevant to this action, Guidant knew, and had reason to know, that the H135 Device was not safe for the individuals for whom it was prescribed and implanted, because

1  the Device short circuited and otherwise malfunctioned, and therefore failed to operate in a safe and

2  continuous manner, causing serious medical problems and, in some individuals, catastrophic injuries

3  and deaths.

4      90.    As a result of defects in both the design and the manufacture of the H135 Device

5  (defects which Guidant concealed), Guidant knew and had reason to know that the Device would

6  fail to function properly, and have a significantly decreased life expectancy.

7      91.    Further, Guidant knew and had reason to know that the life expectancy of the Device

8  was significantly shorter than that which Guidant represented to the FDA, the medical community,

9  and those in whom the Device was implanted. Guidant affirmatively concealed and suppressed the

10 true information about the life expectancy and reliability of the Device.

11     92.    At all times relevant to this action, Guidant knew, and had reason to know, that the

12 H135 device was not safe and effective for the individuals for whom it was prescribed and

13 implanted, because after short circuiting the Device could fail to function and the internal memory

14 within the Device would be erased, thereby concealing both evidence of the short circuit and any

15 medical memory of the patient's arrhythmias in the period preceding the short-circuiting episode.

16 This malfunction prevents the doctor from properly reviewing the patient's heart rhythm history, and

17 from providing related medical services, such as possibly adjusting necessary medication. Further,

18 while Guidant has recommended that doctors consider inducing shocks to their patients to determine

19 if the devices are already malfunctioning, it is otherwise impossible for doctors to test these devices

20 to determine whether they will short circuit and fail to perform as intended.

21     93.    Nonetheless, in its June 24, 2005 letter to patients, Guidant continued to falsely

22 reassure the public that "[t]he safety and well being of patients is foremost in our minds" and that

23 Guidant maintains a "steadfast dedication to patients." (Letter from Allan Gorsett, Vice President,

24 Reliability and Quality Assurance, Guidant Corp., to Patients with Contak Renewal 1 & 2 Devices

25 at 1 (June 24, 2005)).

26     94.    The Independent Panel, however, found that Guidant's quality control processes—

27 particularly with respect to post-market evaluation of the Device— were not consistent with

28 appropriate concern for patients and quality. For example, the Independent Panel concluded that no

COMPLAINT

- 17 -

1    medical professionals are involved in Guidant's post-market surveillance, that positions critical to

2    the assessment of Device defects were consistently understaffed by Guidant, and that the few

3    individuals who were assigned to the important task of assessing Device defects generally lacked

4    sufficient appropriate training and expertise.

5    ### VII.  THE LIFE AND DEATH OF RAYMOND SAAD

6    95.    Mr. Saad had a severe cardiovascular condition that necessitates the use of an

7    implantable cardiac pacemaker/defibrillator. On or about October 7, 2004, Mr. Saad was implanted

8    with a Guidant Contak Renewal cardiac resynchronization therapy defibrillator, also known as the

9    H135 Device.

10    96.    After October 7, 2004, Mr. Saad first learned that the Guidant Contak Renewal

11    defibrillator implanted in his body had an irregularity that could result in its failure to function. Mr.

12    Saad suffered extreme emotional distress as a result of the knowledge of the defective nature of his

13    implanted H135 Device, and knowledge that he might have, at any time, been fatally injured because

14    of its malfunction. In addition, he was very concerned that he might get a life-threatening infection

15    of the heart (endocarditis) as a result of the replacement surgery.

16    97.    On or about October 30, 2005, Mr. Saad died as a result of heart failure, attributable

17    directly to the defects in the H135 Device implanted in him.

18    ### VIII.  THE ACTS AND OMISSIONS AT THE MORTUARY

19    98.    At the direction of Mr. Saad's widow, Seta Saad, Mr. Saad's body was transported

20    to a mortuary in San Francisco. That mortuary was owned and operated by Ashley & McMullen and

21    Ashley & McMullen-Wing Sun Mortuary. Within a day following transport, Ms. Saad spoke with

22    a representative of Guidant on the phone. She expressed concerns regarding possible defects in the

23    device.  The Guidant representative requested if Guidant could perform a non-invasive test or

24    reading of the device, which was still implanted in Mr. Saad's body.  She said this would be

25    permissible *as long as she could be present.*

26    99.    Following the phone conversation between Ms. Saad and Guidant, Guidant employee

27    Craig Lawrence contacted the mortuary and informed persons there that Guidant had authority from

28    Ms. Saad to perform a test or reading of the HR 135 device. Without confirming with Ms. Saad

1  beforehand, the Mortuary agreed to allow Guidant to perform the test. The test was performed soon

2  thereafter by Guidant employee David McCallum. No one informed Ms. Saad that the test would

3  be taking place, and she was not present while the test was performed.

4      100.    The day following the test or reading of the device, Guidant sent another agent to

5  remove the device from Mr. Saad's body. The Guidant agent who performed the removal was a

6  person named Joseph Lopez. The extracted device was taken from the Mortuary by Guidant's agent

7  and returned by him to Guidant. Guidant maintains custody of the device to this day.

8      101.    Neither Ms. Saad nor Christian Saad granted any authority to anyone to extract the

9  device.

10                              **CLAIMS FOR RELIEF**

11                                  **COUNT I**

12                              **STRICT LIABILITY**

13               **DESIGN AND/OR MANUFACTURING DEFECT**

14                  **(By All Plaintiffs Against Guidant Defendants)**

15      102.    Plaintiffs hereby incorporate by reference all paragraphs preceding the Claims For

16  Relief sections of Plaintiffs' Complaint as if fully set forth herein.

17      103.    The H135 Device is defectively designed and/or manufactured because the

18  foreseeable risks of mechanical malfunction and failure outweigh the benefits associated with the

19  Device.

20      104.    The Device was designed and/or manufactured in a manner violative of the Federal

21  Food, Drug and Cosmetic Act, 21 U.S.C. §§ 321 *et seq.* (hereinafter "FDCA"). The facilities or

22  controls used by Defendants in the manufacture, packing, storage, or installation of the Devices were

23  not in conformity with applicable FDCA regulations. The FDA has also concluded that the facilities

24  or controls used by Defendants did not meet the FDCA regulations.

25      105.    The Device was expected to and did reach the Plaintiffs without substantial change

26  or adjustment to its mechanical function before implantation.

27

28

106.    Defendants knew or should have known of the design and/or manufacturing defect and the risk of serious bodily injury that exceeded the benefits associated with the design of the Devices.

107.    Furthermore, the Device and its defects presented an unreasonably dangerous risk beyond what the ordinary consumer would reasonably expect.

108.    The Device was defective due to inadequate warnings or instruction because Defendants knew or should have known that the Device created a high risk of bodily injury and serious harm. Defendants failed to adequately and timely warn consumers of this risk.

109.    The Device was inherently dangerous for its intended use due to design and/or manufacturing defect and improper functioning. Defendants are therefore strictly liable.

110.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have sustained and will continue to sustain severe physical injuries and/or death, severe emotional distress, economic losses, and other damages for which they are entitled to compensatory, equitable, and declaratory relief in an amount to be proven at trial.

111.    Defendants are liable to Plaintiffs jointly and/or severally for all general, special, and equitable relief to which Plaintiffs are entitled by law.

## COUNT II

### STRICT LIABILITY – FAILURE-TO-WARN

### (By All Plaintiffs Against Guidant Defendants)

112.    Plaintiffs hereby incorporate by reference all paragraphs preceding the Claims For Relief sections of Plaintiffs' Complaint as if fully set forth herein.

113.    At all relevant times hereto, Defendants were engaged in the development, testing, manufacturing, marketing and sales of Devices, including the H135 Device. Defendants designed, manufactured, assembled and sold these Devices to medical professionals and their patients, knowing that they would then be implanted in patients with heart disease and disorders.

114.    Defendants distributed and sold the Devices in the condition in which they left their place of manufacture, in their original form of manufacture, which included the defects described herein. The Devices were expected to and did reach Plaintiffs without substantial change in their

COMPLAINT                                                                 - 20 -

1  condition as manufactured and sold by Defendants. At no time did Plaintiffs have reason to believe

2  that the Devices were in a condition not suitable for their proper and intended use among the patients

3  in whom they were to be implanted.

4      115.    The H135 Device that was designed, developed, tested, manufactured, marketed, and

5  sold or otherwise placed into the stream of commerce by Defendants was in a dangerous and

6  defective condition and posed a threat to any user or consumer of the Device. Plaintiffs were and are

7  in a class of persons that Defendants should have considered to be subject to the harm caused by the

8  defective nature of the Device.

9      116.    The H135 Device was implanted and used in the manner for which it was intended,

10  that is, for the detection, correction, and prevention of serious and/or life-threatening harm through

11  surgical implantation. This use has resulted in injury to Plaintiffs.

12      117.    Plaintiffs were not able to discover, nor could they have discovered through the

13  exercise of reasonable care, the defective nature of the Device. Further, in no way could Plaintiffs

14  have known that Defendants had designed, developed, and manufactured the Device in such a way

15  as to increase the risk of harm, injury or death to the recipients of the Device.

16      118.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have

17  sustained and will continue to sustain severe physical injuries, death, severe emotional distress,

18  economic losses and other damages for which they are entitled to compensatory and equitable

19  damages and declaratory relief in an amount to be proven at trial.

20      119.    Defendants are liable to Plaintiffs jointly and/or severally for all general, special, and

21  equitable relief to which Plaintiffs are entitled by law.

22                              **COUNT III**

23                              **NEGLIGENCE**

24                    **(By All Plaintiffs Against Guidant Defendants)**

25      120.    Plaintiffs hereby incorporate by reference all paragraphs preceding the Claims For

26  Relief sections of Plaintiffs' Complaint as if fully set forth herein.

27      121.    At all relevant times, Defendants owed a duty of ordinary care to Plaintiffs. This duty

28  is embodied in *California Civil Code* § 1714, and in the common law of this State.

122. Defendants breached their duty of reasonable care to Plaintiffs by incorporating a defect into the design of the Devices, thereby causing Plaintiffs' injuries.

123. Defendants breached their duty of reasonable care to Plaintiffs by manufacturing and assembling the Devices in such a manner that they could short circuit and/or otherwise fail to operate and malfunction and expose Plaintiff Raymond Saad to life-threatening physical trauma.

124. Defendants breached their duty of reasonable care to Plaintiffs by failing to notify and warn the FDA, Plaintiff Raymond Saad and his treating physicians at the earliest possible date of known design or manufacturing defects in the H135 Device.

125. Defendants breached their duty of reasonable care to Plaintiffs by failing to obtain authorization from Mrs. Saad or Christian Saad to inspect the body of Raymond Saad and perform tests without her being present. They breached their duty, also, by extracting the defective device from Mr. Saad's body without obtaining permission from Ms. Saad or Christian Saad.

126. Defendants breached their duty of reasonable care to Plaintiffs by failing to exercise due care under the circumstances.

127. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have sustained and will continue to sustain severe emotional distress, economic losses and other damages for which they are entitled to compensatory, equitable and declaratory relief in an amount and to an extent to be proven at trial.

128. Defendants are liable to Plaintiffs jointly and/or severally for all general, special and equitable relief to which Plaintiffs are entitled by law.

## COUNT IV

## NEGLIGENCE PER SE

### (By All Plaintiffs Against Guidant Defendants)

129. Plaintiffs hereby incorporate by reference all paragraphs preceding the Claims For Relief sections of Plaintiffs' Complaint as if fully set forth herein.

130. Defendants have an obligation not to violate the law in the manufacture, design, testing, assembly, inspection, labeling, packaging, supplying, marketing, selling, advertising,

1    preparing for use, warning of the risks and dangers of the Devices, and otherwise distributing the
2    Devices.
3        131.   Defendants' acts constitute an adulteration, misbranding, or both, as defined by the
4    Federal FDCA, 21 U.S.C. §§ 331(a) and 333(a)(2), and constitute a breach of duty subjecting
5    Defendants to civil liability for all damages arising therefrom and from parallel state law
6    requirements, under theories of negligence per se.
7        132.   Plaintiffs, as purchasers of the Defendants' Devices, are within the class of persons
8    the statutes and regulations described in the previous paragraph are designed to protect and
9    Plaintiffs' injuries are the type of harm these statutes and regulations are designed to prevent.
10       133.   Furthermore, by gaining access to the body of Raymond Saad and extracting the
11   defective device from that body without obtaining the consent of Mr. Saad's successors-in-interest,
12   Defendants violated *Penal Code* §§ 487 and 642, and *Health and Safety Code* § 7114, thereby
13   subjecting themselves to civil liability for all damages arising therefrom.
14       134.   Plaintiffs, as successors-in-interest and next-of-kin of Raymond Saad, are within the
15   class of persons the statutes identified in the previous paragraph are designed to protect and
16   Plaintiffs' injuries are the type of harm these statutes are designed to prevent.
17       135.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have
18   sustained and will continue to sustain severe physical injuries and/or death, severe emotional
19   distress, economic losses and other damages for which they are entitled to compensatory, equitable,
20   and declaratory relief in an amount to be proven at trial.
21       136.   Defendants are liable to Plaintiffs jointly and/or severally for all general, special, and
22   equitable relief to which Plaintiffs are entitled by law.
23                               ## COUNT V
24                             ## NEGLIGENCE
25        **(By Plaintiffs Seta Saad and Christian Saad Against Ashley & McMullan**
26                **and Ashley & McMullan-Wing Sun)**
27       137.   Plaintiffs hereby incorporate by reference all paragraphs preceding the Claims For
28   Relief sections of Plaintiffs' Complaint as if fully set forth herein.

138.   At all relevant times, Defendants owed a duty of ordinary or reasonable care to Plaintiffs to avoid causing them injury. This duty is embodied in *California Civil Code* § 1714, and in the common law of this State.

139.   Defendants breached their duty of ordinary or reasonable care to Plaintiffs by permitting Guidant agents and employees access to Mr. Saad's body for the purpose of performing tests or readings on the implanted H135 Device without obtaining the Plaintiffs' approval beforehand.

140.   Defendants breached their duty of ordinary or reasonable care to Plaintiffs by permitting Guidant agents and employees access to Mr. Saad's body for the purpose of extracting the implanted H135 Device from that body without obtaining the Plaintiffs' approval beforehand.

141.   Defendants breached their duty of ordinary or reasonable care to Plaintiffs by permitting Guidant agents and employees to take the extracted H135 Device from the mortuary.

142.   Defendants breached their duty of reasonable care to Plaintiffs by failing to exercise due care under the circumstances.

143.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have sustained damage, including severe emotional distress and monetary loss, for which they are entitled to compensatory, equitable, and declaratory relief in an amount to be proven at trial.

144.   Defendants are liable to Plaintiffs jointly and/or severally for all general, special and equitable relief to which Plaintiffs are entitled by law.

<u>COUNT VI</u>

<u>BREACH OF IMPLIED WARRANTY</u>

<u>(By All Plaintiffs Against Guidant Defendants)</u>

145.   Plaintiffs hereby incorporate by reference all paragraphs preceding the Claims For Relief sections of Plaintiffs' Complaint as if fully set forth herein.

146.   Defendants impliedly warranted that the H135 Device, which Defendants designed, manufactured, assembled, promoted and sold to Plaintiffs, were merchantable and fit and safe for ordinary use. Defendants further impliedly warranted that their Device, which Defendants designed, manufactured, assembled, promoted and sold to Plaintiffs, were fit for their particular purposes.

COMPLAINT                                                                 - 24 -

1    147.   Defendants' Device was defective, unmerchantable, and unfit for ordinary use when
2  sold, and unfit for the particular purpose for which they were sold, and subjected Plaintiffs to severe
3  and permanent injuries and death. Therefore, Defendants breached the implied warranties of
4  merchantability and fitness for a particular purpose when their Device was sold to Plaintiffs, in that
5  the Device was defective and had short circuited or otherwise failed to function, or was subject to
6  an enhanced risk that it would not function, as represented and intended.

7    148.   Any disclaimers of implied warranties are ineffectual as they were not provided to
8  Plaintiffs or otherwise made known to Plaintiffs. In addition, any such disclaimers are
9  unconscionable.

10    149.   Any purported written warranty fails of its essential purpose.

11    150.   As a direct and proximate result of Defendants' breach of implied warranties,
12  Plaintiffs have sustained economic losses and other damages for which they are entitled to
13  compensatory and equitable relief in an amount to be proven at trial. Any disclaimer of consequential
14  damages is invalid as the limited remedy provided fails in its essential purpose to redress the harm
15  and damages to Plaintiffs in that it, in effect, provides no remedy at all for the defect necessary to
16  be redressed. In addition, any such disclaimer of consequential damages is unconscionable.

17    151.   Defendants are liable to Plaintiffs jointly and/or severally for all damages to which
18  Plaintiffs are entitled by law.

19                    **COUNT VII**

20    **BREACH OF ASSUMED CONTRACTUAL WARRANTY OBLIGATIONS**

21          **(By All Plaintiffs Against Guidant Defendants)**

22    152.   Plaintiffs hereby incorporate by reference all paragraphs preceding the Claims For
23  Relief sections of Plaintiffs' Complaint as if fully set forth herein.

24    153.   Defendants have acknowledged their obligations as first-party insurer by providing
25  express and/or implied warranties directly to consumers of their products, and specifically the
26  Devices.

27

28

COMPLAINT                                              - 25 -

154.    Defendants have an obligation to repay Plaintiffs for all costs incurred with the H135 Device because they have acknowledged a responsibility under their warranties to make payment with regard to the Device.

155.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered damages including health care costs that have been paid by them in an amount to be proven at trial.

156.    Defendants are liable to Plaintiffs jointly and/or severally for all general, special and equitable relief to which Plaintiffs are entitled by law.

## COUNT VIII

## FRAUD

### (By All Plaintiffs Against Guidant Defendants)

157.    Plaintiffs hereby incorporate by reference all paragraphs preceding the Claims For Relief sections of Plaintiffs' Complaint as if fully set forth herein.

158.    Contrary to Defendants' representations to Plaintiffs, Defendants' H135 Device could cause severe injury or death. In fact, short circuits of the Device were known to Defendants to have occurred for years. At all times during the course of dealing between Defendants and Plaintiffs, directly or through their physicians or other agents, Defendants misrepresented that the Device was safe and effective for its intended use by affirmative misrepresentation; actively concealed and knowingly or recklessly omitted material facts regarding the safety and effectiveness of the Device; and/or by their course of conscious or intentional conduct succeeded in selling and marketing dangerous, defective and ineffective medical devices to be implanted in the human body.

159.    Defendants, by concealment or other action, intentionally prevented Plaintiffs, Plaintiffs' physicians, and Plaintiffs' other agents from acquiring material information regarding the lack of safety and effectiveness of the Device, and are subject to the same liability to Plaintiffs for Plaintiffs' pecuniary losses, as though Defendants had stated the non-existence of such material information regarding the Device's lack of safety and effectiveness, and dangers and defects, as though Defendants had affirmatively stated the non-existence of such matters that Plaintiffs were

COMPLAINT                                    - 26 -

thus prevented from discovering, and therefore have liability for fraudulent concealment under all applicable law, including, *inter alia, Restatement (Second) of Torts* § 550 (1977).

160.    Defendants were under a duty and failed to discharge their duty to exercise reasonable care to disclose to all Plaintiffs the defective nature of the Device, of which they had special knowledge not available to Plaintiffs, and as to which they made affirmative representations in violation of all applicable laws, including, *inter alia, Restatement (Second) of Torts* § 551 (1977).

161.    Defendants' misrepresentations, concealment, suppression and omissions were made willfully, wantonly, uniformly, deliberately or recklessly, in order to induce Plaintiffs to purchase Defendants' Device and/or agree to have the Device implanted into Plaintiff Raymond Saad's body, and Plaintiffs did reasonably and justifiably rely upon the material misrepresentations and omissions made by the Defendants about the Device when agreeing to purchase and/or have the Devices implanted.

162.    As a direct and proximate result of Defendants' fraudulent conduct, Plaintiffs have suffered personal injuries and/or pecuniary losses and economic damages, including health care costs that have been paid by them, or on their behalf, in an amount to be proven at trial.

163.    Defendants are liable to Plaintiffs jointly and/or severally for all general, special, and equitable relief to which Plaintiffs are entitled by law.

## COUNT IX

## CONSTRUCTIVE FRAUD

## (By All Plaintiffs Against Guidant Defendants)

164.    Plaintiffs hereby incorporate by reference all paragraphs preceding the Claims For Relief sections of Plaintiffs' Complaint as if fully set forth herein.

165.    At the time of selling the Device to Plaintiffs, Defendants were in a unique position of knowledge concerning the safety and effectiveness of the H135 Device, which knowledge was not possessed by Plaintiffs, and Defendants thereby held a position of superiority over Plaintiffs.

166.    Through their unique knowledge and expertise regarding the defective nature of the H135 Device, and through their marketing of this device to be implanted in the human body and statements to physicians and their patients in advertisements, promotional materials, and other

1  communications, Defendants professed to Plaintiffs that they were in possession of facts

2  demonstrating that the Device was safe and effective for its intended use and was not defective.

3      167.    Defendants' representations to Plaintiffs were unqualified statements made to induce

4  Plaintiffs to purchase the Device, and Plaintiffs relied upon the statements when purchasing the

5  device and having it implanted.

6      168.    Defendants took unconscionable advantage of their dominant position of knowledge

7  with regard to Plaintiffs and engaged in constructive fraud in their relationship with Plaintiffs.

8  Plaintiffs reasonably relied on Defendants' representations.

9      169.    As a direct and proximate result of Defendants' constructive fraud, Plaintiffs have

10  suffered personal injuries, pecuniary losses, and/or economic damages, including health care costs

11  that have been paid by them, and on their behalf, in an amount to be proven at trial.

12      170.    Defendants are liable to Plaintiffs jointly and/or severally for all general, special, and

13  equitable relief to which Plaintiffs are entitled by law.

## COUNT X

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### (By All Plaintiffs Against Guidant Defendants)

17      171.    Plaintiffs hereby incorporate by reference all paragraphs preceding the Claims For

18  Relief sections; and the Negligence Count of Plaintiffs' Complaint as if fully set forth herein.

19      172.    Defendants carelessly and negligently manufactured, marketed, and sold the H135

20  Device to Plaintiffs, carelessly and negligently concealed its defects from Plaintiffs, and carelessly

21  and negligently misrepresented the quality, safety, and usefulness of the Device. Defendants should

22  have realized that such conduct involved an unreasonable risk of causing emotional distress to

23  reasonable persons, that might, in turn, result in illness or bodily harm.

24      173.    Defendants owed a duty to treating physicians and ultimate End Users of the Device,

25  including Plaintiffs, to accurately and truthfully represent the risks of the Device.

26      174.    Defendants breached that duty by misrepresenting and/or failing to issue adequate

27  warnings of the risks of the Device to the Raymond Saad's treating physicians and to the Plaintiffs.

28

COMPLAINT                                                                    - 28 -

175.    As a direct and proximate result of Defendants' wrongful conduct and breach of duty, Plaintiffs have sustained and will continue to sustain severe emotional distress either due to physical injury or a rational fear of physical injury or death or to the actual death of Raymond Saad, and are entitled to recovery of damages in an amount to be proven at trial.

176.    Defendants are liable to Plaintiffs jointly and/or severally for all general, special and equitable relief to which Plaintiffs are entitled by law.

## COUNT XI

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

## (By Seta Saad and Christian Saad Against Ashley & McMullan

## and Ashley & McMullan-Wing Sun Mortuary)

177.    Plaintiffs hereby incorporate by reference all paragraphs preceding the Claims For Relief sections; and the Negligence Count of Plaintiffs' Complaint as if fully set forth herein.

178.    Defendants owed a duty of ordinary or reasonable care to Plaintiffs to avoid causing them, via their actions or omissions, emotional distress.

179.    Defendants carelessly and negligently allowed Guidant's agents and employees access to the body of Raymond Saad for the purpose of conducting tests or readings and extracting the defective H135 Device.

180.    The carving into the body of Raymond Saad amounted to the desecration of a corpse, which all cultures, in all times, have held to be an extreme taboo. The desecration of a corpse is a vile act. The act is one that gives rise to extreme revulsion. That revulsion is significantly greater when felt by one whose loved one's body has been desecrated. With such revulsion is added extreme heart-ache, anxiety, anger, dismay and a host of other emotions.

181.    As a direct and proximate result of Defendants' wrongful conduct and breach of duty, Plaintiffs have sustained and will continue to sustain severe emotional distress due to the continuing sense of revulsion and anxiety and are thus entitled to damages in an amount to be proven at trial.

182.    Defendants are liable to Plaintiffs jointly and/or severally for all general, special and equitable relief to which Plaintiffs are entitled by law.

## COUNT XII

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (By All Plaintiffs Against Guidant Defendants)

183.    Plaintiffs hereby incorporate by reference all paragraphs preceding the Claims For Relief sections; and the intentional wrongdoing allegations of Plaintiffs' Complaint as if fully set forth herein.

184.    Defendants' conduct directed toward Plaintiffs, was, by act and omission, intentional, knowing, and/or reckless, and evidenced a willful intention to inflict injury upon Plaintiffs, or a reckless disregard for the rights and interests of Plaintiffs equivalent to an intentional violation of them. This conduct exceeded all bounds usually tolerated by decent and civilized society and was directed toward an inherently vulnerable cardiac patient and his family.

185.    As a direct, proximate, intended, known, natural, and foreseeable result of Defendants' conduct, Plaintiffs were and are suffering injury in the form of serious, severe, extreme emotional distress that no reasonable person could or should be expected to endure.

186.    Defendants are liable and accountable at law to compensate Plaintiffs for such emotional distress, and for all such damages and injuries resulting therefrom and related thereto.

187.    Defendants' conduct was intentional, knowing, oppressive, fraudulent, malicious, extreme and outrageous, and done in conscious and reckless disregard of Plaintiffs' rights, thereby entitling Plaintiffs to seek to assert claims for exemplary and punitive damages, at the appropriate time under governing law, in an amount sufficient, necessary and appropriate to punish Defendants for their reprehensible conduct and to deter them and others from such conduct in the future.

188.    Defendants are liable to Plaintiffs jointly and/or severally for all general, special and equitable relief to which Plaintiffs are entitled by law.

## COUNT XIII

## GROSS NEGLIGENCE/MALICE

### (By All Plaintiffs Against Guidant Defendants)

189.    Plaintiffs hereby incorporate by reference all paragraphs preceding the Claims For Relief sections of Plaintiffs' Complaint as if fully set forth herein.

190.    The wrongs done by Defendants were aggravated by the kind of malice, fraud, and reckless disregard for the rights of others, the public, and Plaintiffs for which the law would allow, and which Plaintiffs will seek at the appropriate time under governing law for the imposition of exemplary damages, in that Defendants' conduct: was specifically intended to cause substantial injury to Plaintiffs; or when viewed objectively from Defendants' standpoint at the time of the conduct, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and Defendants were actually, subjectively aware of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others; or included a material representation that was false, with Defendants knowing that it was false or with reckless disregard as to its truth and as a positive assertion, with the intent that the representation is acted on by Plaintiffs. Plaintiffs relied on the representation and suffered injury as a proximate result of this reliance.

191.    Plaintiffs therefore will seek to assert claims for exemplary damages at the appropriate time under governing law in an amount within the jurisdictional limits of the Court. Plaintiffs also allege that the acts and omissions of named Defendants, whether taken singularly or in combination with others, constitute gross negligence that proximately caused the injuries to Plaintiffs. In that regard, Plaintiffs will, as noted, seek exemplary damages in an amount that would punish Defendants for their conduct and which would deter other manufacturers from engaging in such misconduct in the future.

## COUNT XIV

## UNFAIR COMPETITION AND UNFAIR BUSINESS PRACTICES

### (*California Business and Professions Code* Sections 17000 et seq. and 17200 et seq.)

### (By all Plaintiffs Against Guidant Defendants)

192.    Plaintiffs hereby incorporate by reference all paragraphs preceding the Claims For Relief sections of Plaintiffs' Complaint as if fully set forth herein.

193.    Defendants are "persons" as defined under *California Business and Professions Code* § 17021.54. Each of the directors, officers and/or agents of Defendants are equally responsible for the acts of the others as set forth in *California Business and Professions Code* § 17095.55.

COMPLAINT

194.   Defendants manufactured and sold various heart regulating and heart monitoring devices, including the H135 Device, to the "public" as defined in *Business and Professions Code* §§ 17022 and 17024.

195.   Plaintiffs are informed and believe that for the last four years, Defendants have unfairly and unlawfully designed, manufactured, marketed, distributed and sold the H135 Device to the public. Plaintiffs are informed and believe, that Defendants' conduct occurred in violation of Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 321 *et seq.* and other portion of the federal regulatory scheme described in Sections IV and VI of this Complaint.

196.   Defendants' failure to abide by the aforementioned federal regulatory scheme is either unfair and/or an offense punishable by statutory fine and/or imprisonment for each violation. Defendants' acts constitute a continuing and ongoing unfair and unlawful activity prohibited by *California Business and Professions Code* sections 17200 et seq., and justify the issuance of an injunction, the making of restitution and the imposition of other equitable relief pursuant to *Business and Professions Code* § 17203, as to Guidant Corporation, Guidant Sales Corporation, and Boston Scientific Corporation, and each of these Defendants' managing agents and officers.

197.   As set forth below, Plaintiffs are informed and believe that by failing to abide by the aforementioned federal regulatory scheme, Defendants have engaged in business within the State of California selling products to the public, as defined in *Business and Professions Code* §§§ 17026, 17029, and 17073, for the purpose of injuring competitors and/or destroying competition in violation of *Business and Professions Code* § 17043.

198.   Plaintiffs are informed and believe that Defendants have instructed and directed its directors, officers, employees, and/or agents to intentionally and unlawfully violate the aforementioned federal regulatory scheme as a means of gaining an unfair advantage over their competitors in violation of *Business and Professions Code* § 17047. The advantage gained from violation of the Unfair Business Practices Act accrues, among other ways, in the form of a lower cost of doing business and an increased margin of profit.

199.   Plaintiffs are informed and believe that Defendants committed further violations of the law in an effort to keep hidden from Plaintiffs and the general public the defective nature of the

COMPLAINT                                                    - 32 -

1    H135 Device. Defendants did this by falsely claiming authority to conduct an autopsy on the body
2    of Raymond Saad, and then wilfully and maliciously taking the defective H135 Device from his
3    body. This conduct amounted to grand larceny, theft from a corpse, and unlawful conduct of an
4    autopsy, as defined, respectively, in *California Penal Code* § 487, *California Penal Code* § 642 and
5    *California Health and Safety Code* § 7114, and the relevant case law of this State.

6        200.    As a result of these acts and omissions by Defendants, the Plaintiffs, on information
7    and belief, allege that Defendant was able to unfairly compete with other entities engaged in the
8    business of selling heart regulating and heart monitoring devices in the State of California in
9    violation of *Business and Professions Code*, §§ 17000 et seq. and §§17200 et seq. Due to these
10    unfair, fraudulent and/or unlawful business practices, Defendants have gained a competitive
11    advantage over other comparable business entities doing business in the State of California who
12    adhere to the aforementioned federal regulatory scheme.

13        201.    The victims of these unfair and/or unlawful business practices include the Plaintiffs,
14    Defendants' competitors, and the consuming public. Plaintiffs are informed, believe and allege that
15    Defendant performed the above-mentioned acts with the intent of gaining an unfair competitive
16    advantage and thereby injuring Plaintiffs, other competitors, and the consuming public.

17        202.    Each breach of its duty under the aforementioned federal legal scheme in violation of
18    *Business and Professions Code* § 17100 and other statutes is a crime punishable by both a statutory
19    fine and imprisonment. These failures constitute continuing and ongoing unlawful activities
20    prohibited by *Business and Professions Code* sections 17000 et seq. and 17200 et seq. and justify
21    the issuance of an injunction. All such remedies are cumulative pursuant to *Business and*
22    *Professions Code* § 17205.

23        203.    Pursuant to *Business and Professions Code* § 17203, Plaintiffs, in their individual and
24    representative capacities, request restitution and/or disgorgement of all money wrongfully obtained
25    by Defendants which had been paid to them by any of the Plaintiffs, in violation of *Business and*
26    *Professions Code* sections 17000 et seq. and sections 17200 et seq. Furthermore, Plaintiffs request
27    attorneys' fees and costs pursuant to *California Code of Civil Procedure* § 1021.5, and from the
28    common law doctrine from which that statute was derived, upon a showing of proof, among other

1   things, that they have acted in the public interest and that a significant benefit has been conferred on

2   the general public and/or a large class of persons, as set forth in the *Private Attorney General Act*

3   and the common law of this State.

4       204.    Defendants are liable to Plaintiffs jointly and/or severally for all general, special and

5   equitable relief to which Plaintiffs are entitled by law.

6                                       **COUNT XV**

7                                       **CONVERSION**

8                       **(By Plaintiffs Against Guidant Defendants)**

9       205.    Plaintiffs hereby incorporate by reference all paragraphs preceding the Claims For

10  Relief sections of Plaintiffs' Complaint as if fully set forth herein.

11      206.    The H135 Device was purchased by Raymond Saad and Seta Saad from the

12  Defendants. At the time of his death, Mr. Saad had lawful title to and possession of the H135

13  Device. Upon his death, title remained with his estate. The device, however, remained in Mr.

14  Saad's body.

15      207.    Following Mr. Saad's death, his body was entrusted to the mortuary owned and

16  operated by Defendants Ashley & McMullen and Ashley & McMullen-Wing Sun. While the body

17  reposed at the mortuary, the Guidant Defendants contacted the mortuary and falsely claimed to have

18  obtained Seta Saad's permission to observe the body and take readings from the H135 Device. This,

19  the Mortuary allowed.

20      208.    In addition to taking readings from the H135 Device, the Guidant Defendants wilfully

21  and maliciously extracted the device from Mr. Saad's body and took it away from the Mortuary. The

22  Defendants retain possession of the device to this day.

23      209.    The taking of the H135 Device from Mr. Saad's body was not authorized or approved,

24  either verbally or in writing, by Plaintiffs Seta Saad and Christian Saad. The device belonged to these

25  two Plaintiffs, individually and as the Representatives and Successors-in-Interest of Mr. Saad. As

26  a result, the Defendants' taking and retention of the H135 Device constitutes Conversion.

27

28

210. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs, in their individual and representative capacities, have suffered damages for which they are entitled to compensatory, equitable and declaratory relief in an amount to be proven at trial.

211. Defendants are liable to the Plaintiffs jointly and/or severally for all relief to which the Plaintiffs are entitled by law.

## COUNT XVI

## LOSS OF CONSORTIUM

### (By Seta Saad and Christian Saad Against Guidant Defendants)

212. Plaintiffs hereby incorporate by reference all paragraphs preceding the Claims For Relief sections of Plaintiffs' Complaint as if fully set forth herein.

213. For the reasons set forth herein, the surviving Plaintiffs have necessarily paid and have become liable to pay for medical aid, treatment and for medications, and will necessarily incur further expenses of a similar nature in the future as a proximate result of Defendants' misconduct.

214. For the reasons set forth herein, the surviving Plaintiffs have suffered and will continue to suffer the loss of their loved one's support, companionship, services, society, love, and affection.

215. For Seta Saad, Plaintiffs allege her marital relationship with Raymond Saad has not merely been impaired and depreciated, but destroyed.

216. The surviving Plaintiffs have suffered great emotional pain and mental anguish.

217. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have sustained and will continue to sustain severe emotional distress, economic losses, and other damages for which they are entitled to compensatory, equitable, and declaratory relief in an amount to be proven at trial.

218. Defendants are liable to Plaintiffs jointly and/or severally for all general, special and equitable relief to which Plaintiffs are entitled by law.

//
//
//

COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### COUNT XVII

### WRONGFUL DEATH

### (Cal. Code of Civ. Proc., Pt. 2, Tit. 3, Chap. 4)

### (By Seta Saad and Christian Saad Against Guidant Defendants)

219.    Plaintiffs hereby incorporate by reference all paragraphs preceding the Claims For Relief sections of Plaintiffs' Complaint as if fully set forth herein.

220.    Raymond Saad died as a result of defects in Defendants' H135 Device and is survived by his widow Seta Saad and son Christian Saad.

221.    The representatives/administrators of Raymond Saad's estate bring this claim on behalf of the Raymond Saad's lawful heirs.

222.    Defendants' wrongful conduct has proximately caused Raymond Saad's heirs to suffer the loss of Mr. Saad's companionship, services, society, marital association, love and consortium.

223.    Raymond Saad's estate's representatives brings this claim on behalf of Mr. Saad's lawful heirs for these damages and for all pecuniary losses sustained by the heirs.

224.    Raymond Saad's estate's representatives further plead all wrongful death damages allowed by statute in the state or states in which the causes of action accrued.

### COUNT XVIII

### SURVIVAL ACTION

### (Cal. Code of Civ. Proc., Pt. 2, Tit. 3, Chap. 4)

### (By All Plaintiffs Against Guidant Defendants)

225.    Plaintiffs hereby incorporate by reference all paragraphs preceding the Claims For Relief sections of Plaintiffs' Complaint as if fully set forth herein.

226.    As a direct and proximate result of the conduct of Defendants outlined above, Raymond Saad, prior to his death, suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity of the enjoyment of life, shortened life expectancy, expenses of hospitalization, medical and nursing care and treatment, and loss of earnings as well as loss of ability to earn money.

227. The representatives/administrators of Raymond Saad's estate bring this claim for damages on behalf of Mr. Saad's estate and Mr. Saad's beneficiaries.

228. The representatives/administrators of Raymond Saad's estate further plead all survival damages allowed by statute in the state or states in which the causes of action accrued.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and in their representative capacities, pray for judgment against Defendants as follows:

1. For compensatory damages according to proof;

2. For restitution as requested pursuant to *Business & Professions Code* § 17200 et seq;

3. For leave to seek punitive or exemplary damages against Defendants, at the appropriate time under governing law as determined by the Court, consistent with the degree of Defendants' reprehensibility and the resulting harm or potential harm to Plaintiffs, and in an amount sufficient to punish Defendants and deter others from similar wrongdoing;

4. For a disgorgement of profits and restitution of all costs related to the defective Device;

5. For injunctive relief;

6. For an award of attorneys' fees and costs;

7. For prejudgment interest and the costs of suit;

8. For such other and further relief as this Court may deem just and proper; and

9. For preference in setting the matter for trial pursuant to *Cal. Civ. Proc. Code* § 36.

DATED: 29 October 2007

*THE EDGAR LAW FIRM*

Donald S. Edgar, Esq.
Jeremy R. Fietz, Esq.
Rex Grady, Esq.

COMPLAINT

-37-

1  Donald S. Edgar, Esq., SBN 139324
2  Jeremy R. Fietz, Esq., SBN 200396
   Rex Grady, Esq., SBN 232236
   *EDGAR LAW FIRM*
3  408 College Avenue
   Santa Rosa, California 95401
4  Telephone: (707) 545-3200
   Facsimile: (707) 578-3040
5
   Attorneys for all Plaintiffs
6

ENDORSED
F I L E D
San Francisco County Superior Court

OCT 2 9 2007

GORDON PARK-LI, Clerk
BY: _____ MICHAEL RAYRAY
Deputy Clerk

7
8            SUPERIOR COURT OF CALIFORNIA
9              COUNTY OF SAN FRANCISCO

10  SETA SAAD and CHRISTIAN E. SAAD,          )
    individually and as representatives of the Estate )  Case No: **CGC-07-468614**
11  of Raymond Saad,                          )
                                              )  **(Unlimited Civil)**
12        Plaintiffs,                         )
                                              )  **DECLARATION OF SUCCESSORS IN**
13  v.                                        )  **INTEREST**
                                              )
14  GUIDANT CORPORATION; GUIDANT             )
    SALES CORPORATION; CARDIAC               )
15  PACEMAKERS, INC.; BOSTON SCIENTIFIC      )
    CORPORATION; ASHLEY & MCMULLEN-          )
16  WING SUN MORTUARY, a business entity     )
    form unknown, ASHLEY & MCMULLEN, a       )
17  business entity form unknown; and DOES 1 )
    through 20, inclusive,                   )
18                                            )
          Defendants.                        )
19                                            )

20

21        We, the successors in interest to the Estate if Raymond Saad, hereby declare as follows:

22        1.    Raymond Saad, born July 6, 1955, passed away on October 30, 2005, at San

23  Francisco, California.

24        2.    No proceeding is now pending in California for administration of the decedent's

25  estate.

     3.    An original Certificate of Death is attached hereto as Exhibit A.

---

DECLARATION OF SUCCESSORS IN INTEREST

Page 1

1    4.    The below declarants are the decedent's successors in interest (as defined in Section

2  377.11 of the California Code of Civil Procedure) and succeed to the decedent's interest in the

3  action or proceeding.

4    5.    No other person has a superior right to commence the action or proceeding or to

5  be substituted for the decedent in the pending action or proceeding.

6

7    The undersigned declare under penalty of perjury under the laws of the State of

8  California that the foregoing is true and correct.

9

10

11    Executed this _____ day of October, 2007 at Santa Rosa, California.

12

13    _____

14    Seta Saad, surviving spouse of the Decedent.

15    _____

16    Christian E. Saad, surviving son of the Decedent.

17

18

19

20

21

22

23

24

25

---

DECLARATION OF SUCCESSORS IN INTEREST

Page 2

# STATE OF CALIFORNIA
## CERTIFICATION OF VITAL RECORD

### CITY AND COUNTY OF
### SAN FRANCISCO

**CERTIFICATE OF DEATH**

3200538005138

| | | |
|---|---|---|
| NAME OF DECEDENT—FIRST (Given) | | LOCAL REGISTRATION NUMBER |
| RAYMOND | | |
| 4. DATE OF BIRTH | | |
| 02/22/1953 | | |
| 10. SOCIAL SECURITY NUMBER | 11. EVER IN U.S. ARMED FORCES? | 12. MARITAL STATUS |
| 6-30-5675 | YES ☒ NO ☐ UNK | Married |
| | DECEDENT'S RACE | |
| HS graduate | White | |
| 17. USUAL OCCUPATION | 18. KIND OF BUSINESS OR INDUSTRY | |
| Carpenter | Furniture | |
| 2324 Sloat Blvd | | |
| San Francisco | San Francisco | California |
| | | 2324 Sloat Blvd, San Fra |

**CAUSE OF DEATH**

ORDEN PAS    FIRM
EN GUERRA

| | |
|---|---|
| 126. SIGNATURE OF CORONER / DEPUTY CORONER | 127. DATE |
| Ellen Moffatt | 10/31/2005 |
| | 128. TYPE NAME, TITLE OF CORONER / DEPUTY CORONER |
| | Ellen G. Moffatt, M.D. |
| | Asst. Medical Examiner |

STATE OF CALIFORNIA, CITY, AND COUNTY OF SAN FRANCISCO
This is to certify that the image reproduced hereon is a true copy of
the record on file in the SAN FRANCISCO DEPARTMENT OF PUBLIC
HEALTH as of the date issued.

DATE ISSUED  NOV 0 4 2005

*002331375*

This copy is not valid unless prepared on an engraved border, displaying the date, seal and signature of the City and County Health Officer.

Mitchell Katz, M.D.
Health Officer and Local Registrar

CASE,NUMBER: CG   J7-468614  SETA SAAD et al VS. GUIDANT CORPORATION et al

## <u>NOTICE TO PLAINTIFF</u>

A Case Management.Conference is set for

|            |                                                                                  |
|------------|----------------------------------------------------------------------------------|
| **DATE:**  | MAR-28-2008                                                                        |
| **TIME:**  | 9:00AM                                                                             |
| **PLACE:** | Department 212<br>400 McAllister Street<br>San Francisco, CA 94102-3680          |

All parties must appear and comply with Local Rule 3.

CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference.

However, it would facilitate the issuance of a case management order **without an appearance** at the case management conference if the case management statement is filed, served and lodged in Department 212 twenty-five (25) days before the case management

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state.

## <u>ALTERNATIVE DISPUTE RESOLUTION POLICY REQUIREMENTS</u>

**IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE PARTICIPATE IN EITHER MEDIATION, JUDICIAL OR NON-JUDICIAL ARBITRATION, THE EARLY SETTLEMENT PROGRAM OR SOME SUITABLE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A MANDATORY SETTLEMENT CONFERENCE OR TRIAL. (SEE LOCAL RULE 4)**

Plaintiff must serve a copy of the Alternative Dispute Resolution Information Package on each defendant along with the complaint. All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the Alternative Dispute Resolution Information Package prior to filing the Case Management Statement.

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

Superior Court Alternative Dispute Resolution Coordinator
400 McAllister Street, Room 103
San Francisco, CA 94102
(415) 551-3876

See Local Rules 3.6, 6.0 C and 10 D re stipulation to commissioners acting as temporary judges

# Alternative Dispute Resolution (ADR) Information Package

# Alternatives to Trial

# Here are some other ways to resolve a civil dispute.

The plaintiff must serve a copy of the ADR information package
on each defendant along with the complaint. (CRC 201.9(c))

Superior Court of California
County of San Francisco

## Introduction

Did you know that most civil lawsuits settle without a trial?

And did you know that there are a number of ways to resolve civil disputes without having to sue somebody?

These alternatives to a lawsuit are known as alternative dispute resolutions (ADR). The most common forms of ADR are mediation, arbitration and case evaluation. There are a number of other kinds of ADR as well.

In ADR, trained, impartial persons decide disputes or help parties decide disputes themselves. These persons are called neutrals. For example, in mediation, the neutral is the mediator. Neutrals normally are chosen by the disputing parties or by the court. Neutrals can help parties resolve disputes without having to go to court.

ADR is not new. ADR is available in many communities through dispute resolution programs and private neutrals.

## Advantages of ADR

ADR can have a number of advantages over a lawsuit.

- *ADR can be speedier.* A dispute often can be resolved in a matter of months, even weeks, through ADR, while a lawsuit can take years.

- *ADR can save money.* Court costs, attorneys fees, and expert fees can be saved.

- *ADR can permit more participation.* The parties may have more chances to tell their side of the story than in court and may have more control over the outcome.

- *ADR can be flexible.* The parties can choose the ADR process that is best for them. For example, in mediation the parties may decide how to resolve their dispute.

- *ADR can be cooperative.* This means that the parties having a dispute may work together with the neutral to resolve the dispute and agree to a remedy that makes sense to them, rather than work against each other.

ADR-1  1/06  (bc)

- *ADR can reduce stress.* There are fewer, if any, court appearances. And because ADR can be speedier, and save money, and because the parties are normally cooperative, ADR is easier on the nerves. The parties don't have a lawsuit hanging over their heads for years.

- *ADR can be more satisfying.* For all the above reasons, many people have reported a high degree of satisfaction with ADR.

Because of these advantages, many parties choose ADR to resolve a dispute, instead of filing a lawsuit. Even when a lawsuit has been filed, the court can refer the dispute to a neutral before the parties' position harden and the lawsuit becomes costly. ADR has been used to resolve disputes even after a trial, when the result is appealed.

## Disadvantages of ADR

ADR may not be suitable for every dispute.

- If ADR is binding, the parties normally give up most court protections, including a decision by a judge or jury under formal rules of evidence and procedure, and review for legal error by an appellate court.

- There generally is less opportunity to find out about the other side's case with ADR than with litigation. ADR may not be effective if it takes place before the parties have sufficient information to resolve the dispute.

- The neutral may charge a fee for his or her services.

- If a dispute is not resolved through ADR, the parties may have to put time and money into both ADR and a lawsuit.

- Lawsuits must be brought within specified periods of time, known as statutes of limitation. Parties must be careful not to let a statute of limitations run out while a dispute is in an ADR process.

# ALTERNATIVE DISPUTE RESOLUTION PROGRAMS
## Of the San Francisco Superior Court

"It is the policy of the Superior Court that every noncriminal, nonjuvenile case participate either in an early settlement conference, mediation, arbitration, early neutral evaluation or some other alternative dispute resolution process prior to a mandatory settlement conference or trial." (Superior Court Local Rule 4)

This guide is designed to assist attorneys, their clients and self-represented litigants in complying with San Francisco Superior Court's alternative dispute resolution ("ADR") policy. Attorneys are encouraged to share this guide with clients. By making informed choices about dispute resolution alternatives, attorneys, their clients and self-represented litigants may achieve a more satisfying resolution of civil disputes.

The San Francisco Superior Court currently offers three ADR programs for civil matters; each program is described below:

1) Judicial arbitration
2) Mediation
3) The Early Settlement Program (ESP) in conjunction with the San Francisco Bar Association.

## JUDICIAL ARBITRATION

### Description

In arbitration, a neutral "arbitrator" presides at a hearing where the parties present evidence through exhibits and testimony. The arbitrator applies the law to the facts of the case and makes an award based upon the merits of the case. When the Court orders a case to arbitration it is called judicial arbitration. The goal of arbitration is to provide parties with an adjudication that is earlier, faster, less formal, and usually less expensive than a trial. Upon stipulation of all parties, other civil matters may be submitted to judicial arbitration.

Although not currently a part of the Court's ADR program, civil disputes may also be resolved through private arbitration. Here, the parties

ADR-1  1/06 (bc)

voluntarily consent to arbitration. If all parties agree, private arbitration may be binding and the parties give up the right to judicial review of the arbitrator's decision. In private arbitration, the parties select a private arbitrator and are responsible for paying the arbitrator's fees.

### Operation

Pursuant to CCP 1141.11 and Local Rule 4, all civil actions in which the amount in controversy is $50,000 or less, and no party seeks equitable relief, shall be ordered to arbitration. A case is ordered to arbitration after the Case Management Conference. An arbitrator is chosen from the Court's Arbitration Panel. Most cases ordered to arbitration are also ordered to a pre-arbitration settlement conference. Arbitrations are generally held between 7 and 9 months after a complaint has been filed. Judicial arbitration is <u>not</u> binding unless all parties agree to be bound by the arbitrator's decision. Any party may request a court trial within 30 days after the arbitrator's award has been filed.

### Cost

There is no cost to the parties for judicial arbitration or for the pre-arbitration settlement conference.


# MEDIATION

### Description

Mediation is a voluntary, flexible, and confidential process in which a neutral third party "mediator" facilitates negotiations. The goal of mediation is to reach a mutually satisfactory agreement that resolves all or part of the dispute after exploring the significant interests, needs, and priorities of the parties in light of relevant evidence and the law.

Although there are different styles and approaches to mediation, most mediations begin with presentations of each side's view of the case. The mediator's role is to assist the parties in communicating with each other, expressing their interests, understanding the interests of opposing parties, recognizing areas of agreement and generating options for resolution. Through questions, the mediator aids each party in assessing the strengths and weaknesses of their position.

A mediator does not propose a judgment or provide an evaluation of the merits and value of the case. Many attorneys and litigants find that mediation's emphasis on cooperative dispute resolution produces more satisfactory and enduring resolutions. Mediation's non-adversarial approach is particularly effective in disputes in which the parties have a continuing relationship, where there are multiple parties, where equitable relief is sought, or where strong personal feelings exist.

### Operation

San Francisco Superior Court Local Court Rule 4 **provides three different voluntary mediation programs** for civil disputes. An appropriate program is available for all civil cases, regardless of the type of action or type of relief sought.

To help litigants and attorneys identify qualified mediators, the Superior Court maintains a list of mediation providers whose training and experience have been reviewed and approved by the Court. The list of court approved mediation providers can be found at www.sfgov.org/courts. Litigants are not limited to mediators on the court list and may select any mediator agreed upon by all parties. A mediation provider need not be an attorney.

Local Rule 4.2 D allows for mediation in lieu of judicial arbitration, so long as the parties file a stipulation to mediate within 240 days from the date the complaint is filed. If settlement is not reached through mediation, a case proceeds to trial as scheduled.

### Private Mediation

The Private Mediation program accommodates cases that wish to participate in private mediation to fulfill the court's alternative dispute resolution requirement. The parties select a mediator, panel of mediators or mediation program of their choice to conduct the mediation. The cost of mediation is borne by the parties equally unless the parties agree otherwise.

Parties in civil cases that have not been ordered to arbitration may consent to private mediation at any point before trial. Parties willing to submit a matter to private mediation should indicate this preference on the Stipulation to Alternative Dispute Resolution form or the Case Management Statement (CM-110). Both forms are attached to this packet.

### Mediation Services of the Bar Association of San Francisco

The Mediation Services is a coordinated effort of the San Francisco Superior Court and The Bar Association of San Francisco (BASF) in which a court approved mediator provides three hours of mediation at no charge to the parties. It is designed to afford civil litigants the opportunity to engage in early mediation of a case shortly after filing the complaint, in an effort to resolve the matter before substantial funds are expended on the litigation process. Although the goal of the program is to provide the service at the outset of the litigation, the program may be utilized at anytime throughout the litigation process.

The mediators participating in the program have been pre-approved by the court pursuant to strict educational and experience requirements.

After the filing of the signed Stipulation to Alternative Dispute Resolution form included in this ADR package the parties will be contacted by BASF. Upon payment of the $200 per party administration fee, parties select a specific mediator from the list of court approved mediation providers. The hourly mediator fee beyond the first three hours will vary depending on the mediator selected. Waiver of the administrative fee based on financial hardship is available.

A copy of the Mediation Services rules can be found on the BASF website at www.sfbar.org, or you may call BASF at 415-782-8913

### Judicial Mediation

The Judicial Mediation program is designed to provide early mediation of complex cases by volunteer judges of the San Francisco Superior Court. Cases considered for the program include construction defect, employment discrimination, professional malpractice, insurance coverage, toxic torts and industrial accidents.

Parties interested in judicial mediation should file the Stipulation to Alternative Dispute Resolution form attached to this packet indicating a joint request for inclusion in the program. A preference for a specific judge may be indicated. The court Alternative Dispute Resolution Coordinator will coordinate assignment of cases that qualify for the program.

### Cost

Generally, the cost of Private Mediation ranges from $200 per hour to $400 per hour and is shared equally by the parties. Many mediators are willing to adjust their fees depending upon the income and resources of the parties. Any party who meets certain eligibility requirements may ask the court to appoint a mediator to serve at no cost to the parties.

The Mediation Services of the Bar Association of San Francisco provides three hours of mediation time at no cost with a $200 per party administrative fee.

There is no charge for participation in the Judicial Mediation program.

## EARLY SETTLEMENT PROGRAM

### Description

The Bar Association of San Francisco, in cooperation with the Court, offers an Early Settlement Program ("ESP") as part of the Court's settlement conference calendar. The goal of early settlement is to provide participants an opportunity to reach a mutually acceptable settlement that resolves all or part of the dispute. The two-member volunteer attorney panel reflects a balance between plaintiff and defense attorneys with at least 10 years of trial experience.

As in mediation, there is no set format for the settlement conference. A conference typically begins with a brief meeting with all parties and counsel, in which each is given an opportunity to make an initial statement. The panelists then assist the parties in understanding and candidly discussing the strengths and weaknesses of the case. The Early Settlement Conference is considered a "quasi-judicial" proceeding and, therefore, is not entitled to the statutory confidentiality protections afforded to mediation.

### Operation

Civil cases enter the ESP either voluntarily or through assignment by the Court. Parties who wish to choose the early settlement process should indicate this preference on the status and setting conference statement.

If a matter is assigned to the ESP by the Court, parties may consult the ESP program materials accompanying the "Notice of the Early Settlement Conference" for information regarding removal from the program.

Participants are notified of their ESP conference date approximately 4 months prior to trial. The settlement conference is typically held 2 to 3 months prior to the trial date. The Bar Association's ESP Coordinator informs the participants of names of the panel members and location of the settlement conference approximately 2 weeks prior to the conference date.

Local Rule 4.3 sets out the requirements of the ESP. All parties to a case assigned to the ESP are required to submit a settlement conference statement prior to the conference. All parties, attorneys who will try the case, and insurance representatives with settlement authority are required to attend the settlement conference. If settlement is not reached through the conference, the case proceeds to trial as scheduled.

### *Cost*

All parties must submit a $200 generally non-refundable administrative fee to the Bar Association of San Francisco. Parties who meet certain eligibility requirements may request a fee waiver. For more information, please contact the ESP Coordinator at (415) 982-1600.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

For further information about San Francisco Superior Court ADR programs or dispute resolution alternatives, please contact:

Superior Court Alternative Dispute Resolution Coordinator,
400 McAllister Street, Room 103
San Francisco, CA 94102
(415) 551-3876

or visit the Superior Court Website at
http://sfgov.org/site/courts_page.asp?id=3672

ADR-1  1/06 (bc)

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF SAN FRANCISCO
### 400 McAllister Street, San Francisco, CA  94102-4514

|  |  |
|---|---|
| Plaintiff | Case No. _____ |
| v. | **STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION** |
| Defendant |  |

The parties hereby stipulate that this action shall be submitted to the following alternative dispute resolution process:

☐ Private Mediation      ☐  Mediation Services of BASF   ☐  **Judicial Mediation**
☐ Binding arbitration                                          Judge _____
☐ Non-binding judicial arbitration                            Judge _____
☐ BASF Early Settlement Program
☐ Other ADR process (describe): _____

**Plaintiff(s) and Defendant(s) further agree as follows:**

_____

_____

_____

_____

| Name of Party Stipulating | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
|---|---|---|
| ☐  Plaintiff    ☐  Defendant    ☐  Cross-defendant | | Dated: _____ |

| Name of Party Stipulating | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
|---|---|---|
| ☐  Plaintiff    ☐  Defendant    ☐  Cross-defendant | | Dated: _____ |

| Name of Party Stipulating | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
|---|---|---|
| ☐  Plaintiff    ☐  Defendant    ☐  Cross-defendant | | Dated: _____ |

☐  *Additional signature(s) attached*

ADR-2  3/06                STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION

CM-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|

TELEPHONE NO.:                          FAX NO. *(Optional)*:

E-MAIL ADDRESS *(Optional)*:

ATTORNEY FOR *(Name)*:

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF**

STREET ADDRESS:

MAILING ADDRESS:

CITY AND ZIP CODE:

BRANCH NAME:

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| **CASE MANAGEMENT STATEMENT** | | CASE NUMBER: |
|---|---|---|
| **(Check one):** ☐ **UNLIMITED CASE** (Amount demanded exceeds $25,000) | ☐ **LIMITED CASE** (Amount demanded is $25,000 or less) | |

A CASE MANAGEMENT CONFERENCE is scheduled as follows:

Date:                          Time:          Dept:          Div.:          Room:

Address of court *(if different from the address above)*:

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

1. **Party or parties** *(answer one)*:
   a. ☐ This statement is submitted by party *(name)*:
   b. ☐ This statement is submitted jointly by parties *(names)*:

2. **Complaint and cross-complaint** *(to be answered by plaintiffs and cross-complainants only)*
   a. The complaint was filed on *(date)*:
   b. ☐ The cross-complaint, if any, was filed on *(date)*:

3. **Service** *(to be answered by plaintiffs and cross-complainants only)*.
   a. ☐ All parties named in the complaint and cross-complaint have been served, or have appeared, or have been dismissed.
   b. ☐ The following parties named in the complaint or cross-complaint
      (1) ☐ have not been served *(specify names and explain why not)*:

      (2) ☐ have been served but have not appeared and have not been dismissed *(specify names)*:

      (3) ☐ have had a default entered against them *(specify names)*:

   c. ☐ The following additional parties may be added *(specify names, nature of involvement in case, and the date by which they may be served)*:

4. **Description of case**
   a. Type of case in ☐ complaint ☐ cross-complaint *(describe, including causes of action)*:

**CASE MANAGEMENT STATEMENT**

American LegalNet, Inc.
www.FormsWorkflow.com

| | CM-110 |
|---|---|
| PLAINTIFF/PETITIONER: | CASE NUMBER: |
| DEFENDANT/RESPONDENT: | |

4.  b.   Provide a brief statement of the case, including any damages. (If personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date [indicate source and amount], estimated future medical expenses, lost earnings to date, and estimated future lost earnings. If equitable relief is sought, describe the nature of the relief.)

☐   (If more space is needed, check this box and attach a page designated as Attachment 4b.)

5.   **Jury or nonjury trial**
The party or parties request ☐ a jury trial ☐ a nonjury trial.   (if more than one party, provide the name of each party requesting a jury trial):

6.   **Trial date**
a.   ☐ The trial has been set for (date):
b.   ☐ No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint (if not, explain):

c.   Dates on which parties or attorneys will not be available for trial (specify dates and explain reasons for unavailability):

7.   **Estimated length of trial**
The party or parties estimate that the trial will take (check one):
a.   ☐ days (specify number):
b.   ☐ hours (short causes) (specify):

8.   **Trial representation** (to be answered for each party)
The party or parties will be represented at trial ☐ by the attorney or party listed in the caption ☐ by the following:
a.   Attorney:
b.   Firm:
c.   Address:
d.   Telephone number:
e.   Fax number:
f.   E-mail address:
g.   Party represented:
☐ Additional representation is described in Attachment 8.

9.   **Preference**
☐ This case is entitled to preference (specify code section):

10.   **Alternative Dispute Resolution (ADR)**
a.   Counsel ☐ has ☐ has not provided the ADR information package identified in rule 3.221 to the client and has reviewed ADR options with the client.
b.   ☐ All parties have agreed to a form of ADR. ADR will be completed by (date):
c.   ☐ The case has gone to an ADR process (indicate status):

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

10. d.   The party or parties are willing to participate in *(check all that apply):*

    (1) ☐ Mediation

    (2) ☐ Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to close 15 days before arbitration under Cal. Rules of Court, rule 3.822)

    (3) ☐ Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to remain open until 30 days before trial; order required under Cal. Rules of Court, rule 3.822)

    (4) ☐ Binding judicial arbitration

    (5) ☐ Binding private arbitration

    (6) ☐ Neutral case evaluation

    (7) ☐ Other *(specify):*

    e. ☐ This matter is subject to mandatory judicial arbitration because the amount in controversy does not exceed the statutory limit.

    f. ☐ Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.

    g. ☐ This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court *(specify exemption):*

**11. Settlement conference**

☐ The party or parties are willing to participate in an early settlement conference *(specify when):*

**12. Insurance**

    a. ☐ Insurance carrier, if any, for party filing this statement *(name):*

    b. Reservation of rights: ☐ Yes ☐ No

    c. ☐ Coverage issues will significantly affect resolution of this case *(explain):*

**13. Jurisdiction**

Indicate any matters that may affect the court's jurisdiction or processing of this case, and describe the status.

☐ Bankruptcy ☐ Other *(specify):*

Status:

**14. Related cases, consolidation, and coordination**

    a. ☐ There are companion, underlying, or related cases.

        (1) Name of case:

        (2) Name of court:

        (3) Case number:

        (4) Status:

        ☐ Additional cases are described in Attachment 14a.

    b. ☐ A motion to ☐ consolidate ☐ coordinate will be filed by *(name party):*

**15. Bifurcation**

☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons):*

**16. Other motions**

☐ The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues):*

**CASE MANAGEMENT STATEMENT**

**CM-110**

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**17. Discovery**
    a. ☐ The party or parties have completed all discovery.
    b. ☐ The following discovery will be completed by the date specified *(describe all anticipated discovery):*

        Party                Description                Date

    c. ☐ The following discovery issues are anticipated *(specify):*

**18. Economic Litigation**
    a. ☐ This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90 through 98 will apply to this case.
    b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed *(if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case):*

**19. Other Issues**
    ☐ The party or parties request that the following additional matters be considered or determined at the case management conference *(specify):*

**20. Meet and confer**
    a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court *(if not, explain):*

    b. After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following *(specify):*

**21. Case management orders**
    Previous case management orders in this case are *(check one):* ☐ none ☐ attached as Attachment 21.

**22. Total number of pages attached** *(if any):* _____

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and ADR, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date:

_____    ▶    _____
(TYPE OR PRINT NAME)                (SIGNATURE OF PARTY OR ATTORNEY)

_____    ▶    _____
(TYPE OR PRINT NAME)                (SIGNATURE OF PARTY OR ATTORNEY)
                        ☐ Additional signatures are attached

CM-110 (Rev. January 1, 2007)        **CASE MANAGEMENT STATEMENT**        Page 4 of 4



# Superior Court of California
## County of San Francisco

## Judicial Mediation Program

### Introducing a new court alternative dispute resolution program that provides judicial mediation of complex civil cases

The Judicial Mediation program offers mediation of complex civil litigation by a San Francisco Superior Court judge familiar with the area of the law that is the subject of the controversy.  Cases that will be considered for participation in the program include, but are not limited to professional malpractice, construction, employment, insurance coverage disputes, mass torts and complex commercial litigation.  Judicial mediation offers civil litigants the opportunity to engage in early mediation of a case shortly after filing the complaint in an effort to resolve the matter before substantial funds are expended.  This program may also be utilized at anytime throughout the litigation process.  The panel of judges currently participating in the program includes:

The Honorable David L. Ballati
The Honorable Anne Bouliane
The Honorable Ellen Chaitin
The Honorable John J. Conway
The Honorable Robert L. Dondero
The Honorable Ernest H. Goldsmith
The Honorable Curtis E. A. Karnow
The Honorable Patrick J. Mahoney

The Honorable Tomar Mason
The Honorable James J. McBride
The Honorable Kevin M. McCarthy
The Honorable John E. Munter
The Honorable Ronald Evans Quidachay
The Honorable A. James Robertson, II
The Honorable Mary E. Wiss

Parties interested in judicial mediation should file the Stipulation to Alternative Dispute Resolution form attached to this packet indicating a joint request for inclusion in the program and deliver a courtesy copy to Dept. 212.  A preference for a specific judge may be indicated.  The court Alternative Dispute Resolution Coordinator will facilitate assignment of cases that qualify for the program.

Note:  Space is limited.  Submission of a stipulation to judicial mediation does not guarantee inclusion in the program.  You will receive written notification from the court as to the outcome of your application.

Superior Court Alternative Dispute Resolution
400 McAllister Street, Room 103, San Francisco, CA  94102
(415) 551-3876

12/15/06.